COMISIÓN ESTATAL DE ELECCIONES, demandante y recurrida, v. DEPARTAMENTO DE ESTADO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

Número: CE-92-450    Resuelto: 16 de diciembre de 1993

---

928

*Anabelle Rodríguez, Procuradora General*, abogada de la demandada y recurrente; *David Rivé Rivera*, abogado del demandante y recurrido.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Nos toca resolver si la Ley Electoral de Puerto Rico dispone que en un año eleccionario las agencias y los departamentos gubernamentales del Estado Libre Asociado están obligadas a someter a la Comisión Estatal de Elecciones (en adelante la Comisión), para su autorización, *todos* los anuncios que estas agencias y departamentos deseen publicar.

## I

El 30 de junio de 1992 el Departamento de Estado le solicitó autorización a la Comisión Estatal de Elecciones para difundir unos anuncios invitando a la ciudadanía a celebrar los actos oficiales conmemorativos del día de la Constitución del Estado Libre Asociado de Puerto Rico, el 25 de julio de ese año, en el Parque Luis Muñoz Rivera de San Juan. Esta solicitud de autorización fue presentada a la Comisión por conducto de su Junta Examinadora de Anuncios, conforme con lo dispuesto por el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, y por la Sec. 3.1 del Reglamento de gastos de difusión pública del Gobierno aprobado por la Comisión el 11 de noviembre de 1991.

La Junta Examinadora de Anuncios le dio curso de inmediato a la solicitud en cuestión, aprobándola el 1ro de julio de 1992. Dos (2) semanas más tarde, el Departamento de Estado decidió cambiar la celebración de los actos oficiales de San Juan a Cabo Rojo, lo que hizo necesario formular una nueva solicitud de anuncios para divulgar el cambio de lugar.[1] El Departamento de Estado presentó la nueva solicitud ante la Comisión el 14 de julio,

---

[1] Los hechos estipulados sólo se refieren al cambio en los anuncios originales de prensa y radio respecto al sitio.

tardíamente.(²) Ésta incluía un anuncio de televisión, cuyo texto se sometió a la Comisión por escrito, pero no se sometió una grabación·en video que permitiera a la Comisión examinar su contenido visual.

Antes de que se hubiese obtenido la autorización reglamentaria para estos nuevos anuncios, el Departamento comenzó a anunciarlos por radio y a difundirlos por televisión. Este hecho llegó al conocimiento de la Junta Examinadora de Anuncios, que procedió entonces a citar al Departamento para una vista el 23 de julio para resolver lo relativo a estos nuevos anuncios.

En la vista, el presidente de la Comisión, tomando en consideración la recomendación emitida por la Junta,(³) ordenó a los medios de comunicación escrita, radial y televisiva de Puerto Rico que cesaran y desistieran de publicar o difundir los anuncios aludidos. En dicha orden se incluyó un apercibimiento expreso de sanciones de naturaleza penal. No obstante, esa orden fue dejada sin efecto ese mismo día y sustituida por una orden enmendada también fechada el 23 de julio, idéntica a la original, excepto que iba dirigida exclusivamente al Departamento de Estado y no a los medios de comunicación.(⁴)

Ante estos hechos, el Departamento de Estado, de inmediato, cuestionó judicialmente la validez de la orden enmendada de la Comisión Estatal de Elecciones. Alegó ante el tribunal de instancia que el tipo de anuncio que nos ocupa, que constituye una *invitación* a un acto público, no está incluido en la prohibición general del Art. 8.001 de la

---

(²) La Sec. 3.2 del Reglamento de Gastos de Difusión Pública del Gobierno de 11 de noviembre de 1991, pág. 7, exige que estas solicitudes se presenten "con no menos de 15 días laborables de anticipación a la fecha en .que la agencia proyecte iniciar la emisión del anuncio".

(³) El 21 de julio de 1992 la Junta rindió un informe en el cual recomendó que se ordenara el cese y desista de la difusión de anuncios de televisión.

(⁴) Según surge de la sentencia emitida por el tribunal de instancia, los abogados de la Comisión Estatal de Elecciones (en adelante la Comisión) aseguraron que la orden emitida había sido exclusivamente al Departamento de Estado y no a los medios de comunicación.

Ley Electoral de Puerto Rico, *supra*, el cual sólo restringe aquellos anuncios que exponen "programas, proyectos, logros, realizaciones, proyecciones o planes" de las agencias y los departamentos. Señaló que la Comisión no tenía jurisdicción sobre anuncios que se limitan a invitar a un acto público y que, por lo tanto, éstos podían ser publicados sin necesidad de someterlos a la Comisión, ni obtener su autorización.

Por su parte, la Comisión alegó que durante un año eleccionario y en virtud de lo dispuesto en la Ley Electoral de Puerto Rico y del Reglamento de Gastos de Difusión Pública del Gobierno, *supra*, toda agencia de gobierno que proyecte incurrir en gastos en cualquier medio de difusión *siempre* tiene que solicitar y obtener para ello la autorización previa de la Comisión, ya que la agencia no tiene discreción alguna en cuanto a si somete o no el asunto a la Comisión; que sólo ésta es quien puede decidir en primera instancia si el anuncio se puede difundir o no, y que para ello la agencia tiene que someter el anuncio completo al criterio evaluador de la Comisión, incluyendo, además, una grabación completa de éste si es un anuncio de televisión, para determinar si se ajusta o no al mandato del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*.

Presentada la controversia, el mismo 24 de julio de 1992, el tribunal de instancia dictó sentencia confirmando la decisión de la Comisión al prohibir la publicación de aquellos anuncios que no habían obtenido su aprobación. Entre éstos prohibió la difusión del anuncio televisivo pautado por el Departamento de Estado por entender que éste debió haber sido sometido a la Comisión para su aprobación. Además, el tribunal a quo concluyó que permitir la publicación de los anuncios objetados, sin la previa aprobación de la Comisión, conllevaba crear una excepción a lo dispuesto en la ley cuyo efecto práctico era tornar el estatuto en inmanejable.

Inconforme con la orden del tribunal, el Departamento solicitó la reconsideración de ésta. Además, continuó difundiendo los anuncios no autorizados durante toda la noche de 24 de julio por los canales 2, 4 y 11 de la televisión local.

En vista de que el Departamento publicó los anuncios contraviniendo la orden de la Comisión que había sido avalada judicialmente, la Junta Examinadora de Anuncios comenzó una investigación para esclarecer todo lo relativo a esta actuación del Departamento de Estado. Como parte de su investigación, la Junta Examinadora de Anuncios le solicitó al Departamento de Estado que se abstuviera de hacer desembolso alguno de fondos públicos en pago por la publicación o difusión de los anuncios divulgados en violación a la orden de la Comisión, según ratificada por el Tribunal Superior. Más aún, dicha junta señaló una vista para el 14 de agosto de 1992 para que el Departamento de Estado compareciera a discutir este asunto. Éste, inconforme con la investigación iniciada por la mencionada junta, compareció directamente ante nos el 3 de agosto para solicitar que se paralizaran los procedimientos investigativos en dicho organismo al igual que la vista que había señalado, y pidió, además, que revisáramos la sentencia final dictada por el Tribunal Superior, Sala de San Juan, el 24 de julio. El 7 de agosto de 1992 una Sala nuestra denegó la solicitud del Departamento de Estado *por académica*, pero, en reconsideración, esa misma Sala el 11 de agosto expidió el recurso de revisión solicitado y ordenó paralizar todos los procedimientos pendientes o que se venían llevando a cabo por la Junta y/o la Comisión relativos a este caso. El 17 de agosto la Comisión compareció ante nos alegando que carecíamos de jurisdicción para entender en este recurso, entre otras razones, por el asunto ser académico.

Respecto a la decisión del tribunal de instancia, el Departamento de Estado alegó la comisión de los errores siguientes:

A. Erró el Tribunal Superior, Sala de San Juan, al resolver que una invitación dirigida a la ciudadanía en general, publicada por una agencia gubernamental en un año eleccionario es el tipo de anuncio que requiere de la previa aprobación de la Comisión Estatal de Elecciones antes de su publicación.

B. Erró el Tribunal Superior, Sala de San Juan, al resolver que el Artículo 8.001 de la Ley Electoral de Puerto Rico exige que en un año eleccionario las agencias gubernamentales vienen obligadas a someter a la Comisión Estatal de Elecciones *todos* los anuncios que vayan a publicar.

## II

Por tratarse de una cuestión previa jurisdiccional, antes de comenzar nuestro análisis del asunto planteado en el caso de autos, es menester que examinemos si la petición de *certiorari* presentada por el Departamento es académica.

■ La doctrina de academicidad ha sido dilucidada anteriormente por este Tribunal. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958); *Com. Asuntos de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991); *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991). Constituye una de las manifestaciones concretas del concepto *justiciabilidad*, que, a su vez, acota los límites de la función judicial.[5]

■ Conocido es que los tribunales existen para resolver controversias genuinas que surjan entre partes opues-

---

[5] Notas, *Mootness on Appeal in The Supreme Court*, 83 Harv. L. Rev. 1672 (1970). Véase, además, Notas, *Cases Moot on Appeal; A Limit on the Judicial Power;* 103 U. PA. L. Rev. 772 (1955).

tas que tengan un interés real en obtener un remedio jurídico concreto que tenga un efecto práctico respecto a su disputa. *Com. de la Mujer v. Srio. de Justicia,* supra. Además, poseen la autoridad para determinar si los casos que se plantean ante ellos son o no colusorios, académicos o ficticios.([6])

En *E.L.A. v. Aguayo,* supra, pág. 584 conceptualizamos lo que constituye un caso académico cuando expresamos que

...un caso académico ... es "uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente...

También el Tribunal Supremo de Estados Unidos se ha manifestado en torno a la doctrina de academicidad. En *United States Parole Commn. v. Geraghty,* 445 U.S. 388, 397 (1980),([7]) indicó lo siguiente:

Mootness is the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).

Los tribunales pierden su jurisdicción sobre un caso por academicidad cuando ocurren cambios durante el trámite judicial de una controversia particular que hacen que ésta pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no ha de llegar a tener efecto real alguno en cuanto a esa controversia. Con esta limitación sobre el poder de los tribunales, se persigue evitar el uso

---

([6]) En *E.L.A. v. Aguayo,* 80 D.P.R. 552, 558–559 (1958), establecimos que esta autoridad nace del principio elemental de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.

([7]) Véase, además, H.P. Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1384 (1973).

innecesario de los recursos judiciales y obviar pronunciamientos autoritativos de los tribunales que resulten superfluos. *Com. de la Mujer v. Srio. de Justicia*, supra, págs. 724–725.[8]

■ Cuando se determina que un caso se ha tornado académico, los tribunales deben abstenerse de considerarlo en sus méritos. Ahora bien, existen situaciones especiales en las cuales los tribunales pueden atender un caso aunque sea a todas luces académico. *Asoc. de Periodistas v. González*, supra. Se trata de excepciones a la doctrina de academicidad, como por ejemplo cuando el caso ante el tribunal presenta una cuestión recurrente o susceptible de volver a ocurrir *(capable of repetition), Roe v. Wade*, 410 U.S. 113 (1973); *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969); *So. Pac. Terminal Co. v. Int. Comm. Comm.*, 219 U.S. 498, 515 (1911); o cuando aspectos de la controversia se tornan académicos pero persisten consecuencias colaterales de ésta que tienen vigencia y actualidad. Véanse: R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 122–126; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988; *El Vocero v. Junta de Planificación*, supra, págs. 124–126.

■ En el caso ante nos, a pesar de que las actividades de 25 de julio de 1992 —evidentemente— ya concluyeron y ningún remedio judicial puede evitar ya la divulgación de los anuncios en controversia, es evidente que la conflictiva cuestión de derecho que dio lugar a la disputa entre las partes de este caso es susceptible de volver a ocurrir. Como bien señala la Procuradora General, con marcada frecuencia las agencias y los departamentos gubernamentales se ven en la necesidad de anunciar al país los eventos públicos que habrán de celebrar aun en años electorales y la

---

[8] Véase, además, D.B. Kates y W.T. Baker, *Mootness in Judicial Proceedings: Toward a Coherent Theory*, 62 Cal. L. Rev. 1385 (1974).

postura de la Comisión, si no se dilucida de manera determinante, es potencialmente una fuente de continuos conflictos. No es difícil preveer que si la controversia ante nos no se resuelve finalmente, la parte que promueve la limitación a los anuncios en cuestión, la Comisión, tendrá que volver a los tribunales en el futuro con su planteamiento, litigándolo siempre a última hora, debido a que es un asunto que por su naturaleza tiende a surgir imprevistamente, haciendo muy difícil que sea revisado judicialmente de manera definitiva. Cuando existe la probabilidad de que la controversia se repita o recurra, sobre todo para la misma parte promovente, entonces los tribunales tienen facultad para considerar el asunto planteado, a pesar de que la controversia concreta ante el tribunal haya advenido de forma académica, particularmente en casos como el de autos en los cuales las súbitas controversias entre las partes son de por sí de tan corta duración que pueden eludir la revisión judicial. *Asoc. de Periodistas v. González*, supra, págs. 720–721; *Com. de la Mujer v. Srio. de Justicia*, supra, pág. 726.

Debe notarse, además, que en el caso ante nos también se da otra de las excepciones a la doctrina de academicidad que hemos identificado antes. Como surge de la relación de hechos de esta opinión, en el caso de autos persisten consecuencias colaterales de la controversia principal que aún tienen vigencia y actualidad. Quedan asuntos secundarios importantes por dilucidarse.

Concluimos, pues, que la solicitud de revisión es justiciable y que no existe obstáculo procesal que nos impida evaluarla en sus méritos.

### III

■ Como bien han indicado varios eminentes juristas, la expresión de ideas, creencias, valores y hasta propaganda política goza en nuestro sistema de vida de una

abarcadora protección constitucional porque constituye "el origen y centro de la libertad de expresión". Serrano Geyls, *op. cit.*, Vol. II, pág. 1539. Véase, también, 4 *Treatise on Constitutional Law: Substance and Procedure* Sec. 20.50, pág. 363 (1992). Esa expresión política, como parte esencial que es del entramado de derechos y libertades fundamentales que tienen las personas y los grupos bajo nuestro ordenamiento constitucional, está sujeta a muy pocas limitaciones jurídicas.

El problema ante nos, aunque tiene tangencias con lo relativo a las limitaciones a la propaganda política, no suscita, sin embargo, cuestiones constitucionales. No están en juego los derechos de expresión política de personas o grupos cuya restricción es la que casi siempre levanta problemas constitucionales. Ante nos está la cuestión enteramente distinta de la limitación a la *propaganda gubernamental* respecto a la cual el Estado tiene amplísimos poderes. Por eso el asunto que nos concierne se limita sencillamente a una cuestión de interpretación estatutaria: ¿Cuál es el alcance preciso de la prohibición de *anuncios gubernamentales* que aparece hoy en el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra?* Dicho artículo dispone lo siguiente:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública *con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes.* Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos *anuncios que sean utilizados para difundir información de interés público*, urgencia o emergencia, los cuales sólo serán permitidos *previa autorización al efecto de la Comisión Estatal de Elecciones.* (Énfasis suplido.)

El artículo citado proviene en todos sus aspectos esen-

ciales del derogado Art. 3.014 del antiguo Código Electoral, Ley Núm. 1 de 13 de febrero de 1974 (16 L.P.R.A. sec. 2084).[9] Aunque el historial legislativo de esta disposición es bastante escaso, es importante notar que en el Diario de Sesiones de la Asamblea Legislativa de 4 de febrero de 1974, pág. 154, aparece la siguiente explicación relativa a esta disposición:

> Finalmente se prohíbe a las agencias gubernamentales *anunciarse*. Se les limita a publicar solamente aquello requerido por ley durante el año de elecciones, y solamente en caso de emergencia, se podrá publicar otro tipo de *anuncio*, pero sólo con el permiso del Tribunal Electoral.

De esta cita y del lenguaje suficientemente claro del propio Art. 8.001, *supra*, surge inequívocamente la intención legislativa de excluir definitivamente del proceso político la influencia solapada que el partido en el poder pueda tener mediante el uso de los anuncios gubernamentales. Como dijimos en *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 393 (1984), la disposición en cuestión refleja "el interés en descontinuar durante el período eleccionario la práctica de las agencias gubernamentales de hacer campaña política mediante la publicación de anuncios sobre sus logros y planes".

Para asegurar que se logre esta clara intención legislativa, estamos compelidos a interpretar el alcance del Art. 8.001, *supra*, de modo tal que prevalezca la importante política pública que lo inspira. *Chase Manhattan Bank v. Mun. de San Juan*, 126 D.P.R. 759 (1990); *A.R.P.E. v. Ozores Pérez*, 116 D.P.R. 816 (1986); *Passalacqua v. Mun. de San Juan*, 116 D.P.R. 618 (1985); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772 (1968). No podemos darle a este artículo el alcance que propone el recurrente, Departamento de Estado, sin poner en grave riesgo la consecu-

---

[9] Véase Ley Núm. 1 de 13 de febrero de 1974 (16 L.P.R.A. sec. 2131 *et seq.*). XXVIII (Núm. 18) Diario de Sesiones 188 (1974).

ción de su claro propósito legislativo. Aceptar, como alega el recurrente, que los anuncios gubernamentales "invitando" a actos públicos están totalmente fuera del ámbito del Art. 8.001, *supra*, y que la Comisión no tiene ninguna jurisdicción sobre tales anuncios no sólo es inconsistente con el claro texto de ese artículo, sino que además daría un amplio margen a las agencias y departamentos para obviar o derrotar la política pública que encarna. Atribuirle tal sentido a la disposición en cuestión tendería a socavar la intención legislativa, curso que debemos evitar. *Román Mayol v. Tribunal Superior*, 101 D.P.R. 807 (1973). Como bien señaló el tribunal de instancia, una invitación gubernamental a un acto público puede redactarse de muchas formas distintas. Puede formularse imparcialmente o puede componerse de modo taimado para favorecer al partido en el poder. En un país tan politizado como el nuestro, eximir tales invitaciones del escrutinio imparcial de la Comisión Estatal de Elecciones abriría la puerta a la tentación de incluir alguna propaganda impropia solapadamente en tales invitaciones, dando lugar así a que se evada el mandato legislativo. Tenemos la obligación de evitar que ello ocurra.

Más aún, la pretensión del recurrente, de que tales anuncios no requieren la autorización previa de la Comisión, dejaría en manos de las propias agencias o departamentos la decisión de si determinado anuncio es o no una "invitación" exenta. Le daría a las agencias una ominosa discreción que dificultaría la implantación uniforme del estatuto y crearía el riesgo de que algunos anuncios impermisibles lleguen a la luz pública en contravención de la ley.

Por las razones expuestas[10] resolvemos que conforme a lo dispuesto en el Art. 8.001 de la Ley Electoral de

---

[10] Véanse, además: el análisis y los pronunciamientos afines que antes habían sido expuestos por el Juez Asociado Señor Negrón García en su voto disidente en *P.P.D. v. Junta Revisora Electoral*, 109 D.P.R. 464, 465 (1980), y por el Juez Asociado Señor Rebollo López en su opinión disidente en *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 393 (1984).

Puerto Rico, *supra*, en año electoral todo anuncio guberna-
mental, excepto los expresamente excluidos por ley, debe
ser sometido a la previa autorización de la Comisión. Dicha
comisión velará porque existan los procedimientos acelera-
dos que sean necesarios para expeditar la difusión de
anuncios como el de marras, que evidentemente era publi-
cable debido a que, salvo el cambio de lugar y su reproduc-
ción en video, era idéntico a otro que ya había recibido
aprobación.

Por los fundamentos expuestos, *se confirma la sentencia
dictada por el Tribunal Superior, Sala de San Juan, el 24
de julio de 1992 y se devuelve el caso a la Comisión Estatal
de Elecciones para que continúe con sus procedimientos.*

El Juez Asociado Señor Negrón García emitió una opi-
nión de conformidad. El Juez Asociado Señor Hernández
Denton concurrió con opinión escrita.

## — O —

Opinión de conformidad del Juez Asociado Señor Negrón
  García.

### I

Coincidimos con la opinión de este Tribunal. Contrario a
del Departamento de Estado, este recurso no es académico.
Los hechos no sólo son susceptibles de repetirse, sino que es
la *segunda vez* que se suscitan. Tenemos el conocimiento ju-
dicial de que hace cuatro (4) años, en ocasión de los anuncios
en los cuales se invitaba a la celebración del día de nuestra
Constitución —25 de julio de 1988— el Partido Nuevo Pro-
gresista (P.N.P.) cuestionó que el mismo Departamento de
Estado estuviera difundiéndolos sin autorización previa de
la Comisión Estatal de Elecciones. *P.N.P. v. Hernández, Srio.
D.T.O.P.,* 122 D.P.R. 362, 365 esc. 1 (1988).

[Y ciertamente] una invitación gubernamental a un acto público puede redactarse de muchas formas distintas. Puede formularse imparcialmente o puede componerse de modo taimado para favorecer al partido en el poder. En un país tan politizado como el nuestro, eximir tales invitaciones del escrutinio imparcial de la Comisión Estatal de Elecciones abriría la puerta a la tentación de incluir alguna propaganda impropia solapadamente en tales invitaciones, dando lugar así a que se evada el mandato legislativo. Tenemos la obligación de evitar que ello ocurra. Opinión mayoritaria, pág. 940.

Finalmente, suscribimos la conclusión de que "en año electoral todo anuncio gubernamental, excepto los expresamente excluidos por ley, debe ser sometido a la previa autorización de la Comisión. Opinión mayoritaria, pág. 941.

## II

Con estos pronunciamientos afines, el Tribunal implícitamente adopta hoy la fuerza persuasiva de nuestro *voto disidente* en *P.P.D. v. Junta Revisora Electoral*, 109 D.P.R. 464, 467 (1980), a los efectos de que esa autorización previa

...intenta lograr los siguientes objetivos: (a) directamente, evitar que las agencias gubernamentales usando fondos públicos y so pretexto de exponer sus ejecutorias o planes, realicen solapadamente campaña política en favor del partido en el poder y aquellos incumbentes que aspiran nuevamente a ser electos; (b) reducir las ventajas reconocidas que gozan los candidatos incumbentes —a través del acceso a los electores y el público en general por medio de la televisión, prensa y radio— que el solo ejercicio y exposición del cargo conlleva sobre sus opositores; y (c) indirectamente, frenar los excesos y economizar al erario público y a los contribuyentes los gastos ordinarios de publicidad en año de elecciones.

*Segundo*, indirectamente anula las opiniones del Secretario de Justicia Interino de 27 de junio de 1988 —reafirmada el 15 de agosto de 1988— (no publicadas), que concluían que bajo el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, salvo los anuncios de carácter proselitista, los

demás podían "ser publicados por las agencias concernidas sin necesidad de obtener la autorización de la Comisión Estatal de Elecciones". *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, págs. 371–372.

Y *tercero*, este recurso pone de manifiesto nuevamente que más allá de la posible sanción penal *"[n]o hay forma cabal de neutralizar los posibles efectos publicitarios adversos partidistas de anuncios pagados con fondos públicos de ostensible ilegalidad.* Como corolario, la labor clásica de diseñar judicialmente un resarcimiento pecuniario por los daños experimentados a los partidos minoritarios políticos de oposición y sus electores es que, aunque posible, puede resultar tardía, compleja y de difícil cuantificación". (Énfasis en el original.) *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, págs. 375–376.

Y como indicamos en el referido escolio:

> En ausencia de otro remedio, la evolución jurisprudencial no puede descartar la posibilidad de que los tribunales puedan exigir —con cargo al fondo electoral del partido político que promueve el anuncio ilegal— que se conceda a los partidos minoritarios de oposición una cantidad global pecuniaria equivalente al costo del anuncio, de modo que éstos puedan utilizarla con el fin de contrarrestarlos. *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, pág. 376 esc. 2.

## III

Ese enfoque judicial es impostergable. La prohibición estatutaria que inspiró

> ...a la Asamblea Legislativa es la naturaleza voluble de la opinión pública que, si bien difícil de predecir, es sugestionable. Su texto original fue una reacción a una época en que masivamente hubo intentos gubernamentales en año de elecciones para manipular el pensamiento de los electores en beneficio de los incumbentes, al utilizar los fondos públicos provenientes de todos los ciudadanos y electores del país.
>
> El estatuto admite esa realidad viva y la fuerza creciente en la formulación y manipulación de la opinión pública por los llamados medios de comunicación social: prensa, radio, televi-

sión, etc. Véanse: W. Overbeck y R.D. Pullen, *Mayor Principles of Media Law*, 2da. ed., Nueva York, Ed. Holt, Rinehart y Winston, 1985; D.E. Casper, *Media and the Formation of Public Opinions: A Checklist, 1975–1984*, Illinois Vance Bibliographies, 1985; D.A. Graber, *Mass Media and American Politics*, 2da. ed., Washington D.C., Ed. Congressional Quarterly, 1984. "Como bien ha señalado Alf Ross, la propaganda apunta directamente a los instintos, estando probado que la sugestión emotiva, obedeciendo a normas de psicología colectiva, es mucho más eficaz que las apelaciones subjetivas a la razón ([op.cit.], p[ág]. 32). Por efecto de la propaganda, se puede cambiar la expresión de una voluntad popular 'verdadera' por otra voluntad popular 'sintética' ([i]dem, p[ág]. 32), y frente a este riesgo, que es de tanta peligrosidad para la democracia, estima Ross que la mejor salvaguardia está en 'inmunizar a la población contra la propaganda, es decir, desarrollar en ella un sentido crítico que constituya la mejor inmunización contra la infección espiritual inducida por la sugestión propagandista' ([i]dem, p[ág].32)." Vanossi, *supra*, págs. 1287–1288.

Las agencias de publicidad cuentan con expertos conocedores de la conducta humana. Ideas, imágenes, detalles visuales y gráficos aparentemente insignificantes pueden esconder solapadamente un mensaje político. Por lo tanto, no podemos abstraernos de los adelantos de la industria de las comunicaciones y del desarrollo de complejas técnicas para encubrir mensajes. Así, podría sustituir la burda y repudiada práctica de la compra del voto por una refinada fórmula que penetra el inconsciente del elector. De esta manera, un ingenioso anuncio radial o televisivo puede ser una fina argucia para encubrir un mensaje político-partidista. La Comisión Estatal de Elecciones y los tribunales tienen que estar vigilantes a lo que podrían ser novedosas formas de infringir la Ley Electoral de Puerto Rico. (Escolios omitidos.) *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, págs. 388–389.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton.

Concurrimos con la conclusión en la opinión mayoritaria en cuanto a que esta controversia no es académica.

Sin embargo, es innecesario acudir, como hace la mayoría, a la excepción de la controversia recurrente para deci-

dir que no procede abstenernos de resolver el recurso. Nuestra decisión sobre la legalidad de la actuación del Departamento de Estado tendrá efecto práctico sobre la situación jurídica de éste. De resolver que su actuación fue ilegal, el Departamento estará sujeto a una investigación que lleve a cabo la Comisión Estatal de Elecciones y, además, habrá personas que podrían estar sujetas a sanciones penales por violar la Ley Electoral de Puerto Rico.[1] Debe recordarse que además de estar en juego la legalidad de la difusión de los anuncios que prepara el Departamento de Estado, está también en la balanza la posible responsabilidad del Departamento por difundirlos en directa contravención a las órdenes expresas de la Comisión Estatal de Elecciones y de un tribunal. No hay duda de que nuestra decisión tendrá un impacto práctico sustancial sobre la responsabilidad legal del Departamento de Estado por dichas actuaciones. Por estas razones, la controversia ante nosotros no es académica. En estas circunstancias no consideramos necesario utilizar la excepción de la "controversia recurrente" para concluir que el caso no es académico.

Además, no estamos satisfechos con la exposición y aplicación al caso de la doctrina sobre la excepción de la controversia recurrente. Para que aplique dicha excepción, debe existir una situación en la que haya una probabilidad razonable de que la misma controversia se le presentará de nuevo a la parte promovente y que una vez más no será revisada judicialmente dada la corta duración de los eventos que provocan la controversia.[2]

---

[1] La orden original de la Comisión Estatal de Elecciones mediante la cual prohibió la difusión de los anuncios advertía sobre sanciones penales. El Art. 8.004 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3354, dispone que "[t]oda persona que, a sabiendas y fraudulentamente, obrare en contravención de cualesquierà de las disposiciones de [esta ley], o que teniendo una obligación impuesta por el mismo, voluntariamente dejare de cumplirla, o se negare a ello, será culpable de delito electoral". Este delito se castiga como uno menos grave. Por su parte, el Art. 8.005 (16 L.P.R.A. sec. 3355) dispone que "[t]oda persona que a sabiendas violare cualquier regla o reglamento de la [Comisión] ... será sancionada con pena de reclusión".

[2] J.J. Álvarez González, *Derecho Constitucional*, 61 (Núm. 4) Rev. Jur. U.P.R. 637, 657, 664–672 (1992); la doctrina federal usa el criterio de *reasonable expectation*

La opinión mayoritaria no da la importancia debida ni presta la atención necesaria a los últimos dos (2) de los tres (3) requisitos mencionados: "que probablemente se repita; a la misma parte promovente, y que evite revisión por razones temporales". Aunque hemos expresado que no es necesaria la recurrencia entre las mismas partes, lo cierto es que tanto en *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991), como en *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991), era posible que la controversia se le presentara de nuevo a los allí demandantes y así lo consignamos expresamente. En *Asociación* dijimos que existía la probabilidad de que los periodistas, demandantes en el caso, pudieran verse involucrados en la misma controversia en el futuro ("existe la probabilidad de que tales periodistas, así como otros, puedan ser citados posteriormente a comparecer como testigos en algún procedimiento judicial", *Asociación*, supra, pág. 722). Así mismo, en *Berberena*, supra, pág. 871, expresamos que era posible que los demandantes aspiraran a una nueva candidatura en elecciones futuras y que por lo tanto se vieran involucrados en la misma controversia nuevamente ("la controversia es recurrente respecto a los demandantes apelados, pues pueden aspirar a una nueva candidatura en elecciones futuras"). Sobre esto, véase J.J. Álvarez González.

---

o *demostrated probability* de que la controversia se repita, *Honig v. Doe*, 484 U.S. 305, 318 esc. 6 (1988). Se exige que la controversia pueda repetirse afectando de nuevo al demandante y que probablemente eluda la revisión judicial debido a lo corto de la duración del pleito, *Meyer v. Grant*, 486 U.S. 414, 417 esc. 2 (1988); *Murphy v. Hunt*, 455 U.S. 478, 481–484 (1982).