TEXTO COMPLETO DE LA SENTENCIA
Comparece ante este Tribunal de Apelaciones el Presbyterian Community Hospital, Inc. h/n/c Ashford Presbyterian Community Hospital (Hospital Ashford) solicitando que revoquemos una “Resolución en Reconsideración,,‘ emitida el 14 de noviembre de 2006 por la Secretaría Auxiliar para la Reglamentación y Acreditación de Facilidades de Salud (SAFARS) del Departamento de Salud. Mediante la misma se desestimó por académica una querella presentada por el Hospital Ashford en contra del Centro Tomográfico de Puerto Rico, Inc. (Centro Tomográfico).
Con el beneficio de la comparecencia de las partes y del derecho aplicable, resolvemos.
I
Los incidentes fácticos que desembocan en el asunto que atendemos tuvieron su origen en un contrato suscrito el 3 de abril de 1978 entre el Centro Tomográfico y el Hospital Ashford mediante el cual el primero prestaría servicios al segundo de tomografía computadorizada (CT) y de resonancia magnética (MRI).
Fue en 1979 que el Centro Tomográfico comenzó a ofrecer dichos servicios en las facilidades del Hospital Ashford, ya que en ese año el hospital obtuvo del Departamento de Salud un Certificado de Necesidad y Conveniencia (CNC) que cubría los servicios especializados del Centro Tomográfico.
*1160 En 1989, el Centro Tomográfico y el Hospital Ashford suscribieron un contrato de arrendamiento por las facilidades que el Centro Tomográfico mantenía en el hospital para prestar los servicios de CT y MRI. Este contrato estuvo vigente hasta el 23 de diciembre de 2004.
El 31 de octubre de 2003, el Centro Tomográfico solicitó al Departamento de Salud, y el 16 de marzo de 2004 dicho Departamento emitió, el CNC 04-078, aprobando la reubicación de los equipos de CT y MRI a un local en la Ave. Ashford #1409.
El 26 de agosto de 2005, el Hospital Ashford radicó una querella en el Departamento de Salud contra el Centro Tomográfico solicitando la revocación parcial del CNC 04-078, que como antes expresado dicho Departamento le había expedido al Centro Tomográfico el 16 de marzo de 2004. En la querella, el Hospital Ashford alegó que el Centro Tomográfico no podía, como lo hizo, solicitar la reubicación de los equipos de CT del local donde operó en el hospital a un local ubicado en la Ave. Ashford #1409, a unos 144 pies del Hospital Ashford. Fundamentó esta alegación en que bajo dicho CNC, el equipo perteneciente al Centro Tomográfico, para el cual podía pedir reubicación, era el de MRI y no el de CT, que pertenecía al hospital.
El 13 de octubre de 2005, el Centro Tomográfico contestó la querella y negó las alegaciones de la misma. Levantó como defensas afirmativas que tanto las máquinas de CT como las de MRI eran de su propiedad, y que las operaba en virtud del CNC 92-129. Señaló, inter alia, que la operación del Centro Tomográfico era una totalmente independiente a la del Hospital Ashford.
Estando pendiente de adjudicación de la querella en el Departamento de Salud, el 25 de octubre de 2005, este foro apelativo en el recurso de Centro Tomográfico de Puerto Rico, Inc. v. Departamento de Salud, KLRA-2004-00891, ordenó a dicho Departamento que emitiera a favor del Centro Tomográfico el CNC 05-309 autorizándolo a operar en el local de la Ave. Ashford #1409 equipos de CT y de tomografía por emisión de positrones (PET). Esta sentencia no fue apelada por el Departamento de Salud, por lo que advino final y firme.
Transcurridos múltiples trámites procesales en la atención de la querella del Hospital Ashford, el 9 de enero de 2006, el Centro Tomográfico presentó ante el Departamento de Salud una moción de desestimación. Expuso que en virtud de la sentencia emitida por este Tribunal de Apelaciones (TA), la querella presentada se había tornado académica, ya que bien bajo el CNC 04-078 o bajo el CNC 05-309, el Centro Tomográfico quedó autorizado para operar en las facilidades de la Ave. Ashford #1409.
El 3 de abril de 2006, el Hospital Ashford se opuso a la solicitud de desestimación presentada. Indicó que la querella no debía ser desestimada en virtud de la sentencia emitida por el TA porque a la fecha de la solicitud de reubicación bajo el CNC 04-078, el Centro Tomográfico todavía operaba desde las facilidades del Hospital Ashford localizadas en la Ave. Ashford #1451.
Luego de que las partes presentaran varios escritos en apoyo a sus respectivas contenciones, el 28 de junio de 2006, el Departamento de Salud emitió una resolución mediante la cual desestimó la querella presentada. En la misma concluyó que la realidad práctica era que, en virtud de la sentencia emitida por el TA, el Centro Tomográfico podía seguir ofreciendo servicios de CT en sus nuevas facilidades, hecho que no había sido impugnado por el Hospital Ashford. A esos efectos, determinó que la querella presentada se había tomado académica, por lo que lo solicitado por el Hospital Ashford sería una opinión consultiva que no tendría ningún efecto práctico sobre las partes litigantes.
El Hospital Ashford solicitó la reconsideración del dictamen emitido. Señaló que la querella se circunscribía a solicitar la revocación del CNC 04-078, ya que el Centro Tomográfico había solicitado la reubicación de un CNC del que no era dueño. Añadió, entre otras cosas, que el referido CNC facultaba a operar
*0 [[Image here]]
[[Image here]]
[[Image here]]
[[Image here]]
*1161 al Hospital Ashford y no al Centro Tomográfico, por lo que este último no podía solicitar su reubicación.
El Centro Tomográfico no compareció a oponerse a lo planteado por el Hospital Ashford, aunque se le concedió término para ello.
El 14 de noviembre de 2006, notificada el 28 de noviembre siguiente, el Departamento de Salud emitió una resolución en reconsideración mediante la cual reiteró la desestimación de la querella por académica a la luz de la expedición del CNC 05-039.
De dicho dictamen recurre ante nos el Hospital Ashford.
II
El Hospital Ashford señala la comisión de un único error, a saber:

Erró el Departamento de Salud del Estado Libre Asociado de Puerto Rico al desestimar la querella presentada por el Presbyterian Community Hospital, Inc. contra Centro Tomográfico de Puerto Rico, Inc. por el fundamento de academicidad aun cuando prevalece la controversia entre las partes con relación al CNC Num. 04-078 en cuanto allí se concede la reubicación de la autorización para prestar servicios de tomografia computadorizada a una parte que no tenía derecho a ello y como consecuencia directa de dicha parte haber sometido información falsa y/o incorrecta en la solicitud de reubicación del CNC Núm. 92-129. ”

III
Veamos la normativa aplicable al asunto aquí planteado.
A
La Ley de Certificados de Necesidad y Conveniencia, Ley Núm. 2 del 7 de noviembre de 1975, según enmendada (Ley Núm. 2), 24 L.P.R.A. see. 334 et seq., establece que como requisito para el establecimiento y operación de una facilidad de salud será necesario poseer un CNC. A través de estos certificados, la Asamblea Legislativa ha intentado regular la planificación ordenada de algunas facilidades y servicios de salud para que, de este modo, se puedan atender adecuadamente las necesidades de salud de la población, controlar los costos de los servicios de salud y velar porque éstos se presten en aquellos núcleos poblacionales donde sean necesarios. Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105 (2002). El Secretario de Salud, al otorgar o denegar un CNC, no sólo concede o deniega un permiso para operar una facilidad de salud, sino que planifica el desarrollo de éstas en las distintas áreas regionales de salud. Ruiz Hernández v. Mahiques, 120 D.P.R. 80, 89
La decisión de otorgar o denegar un CNC surge de un proceso evaluativo institucional que culmina con la decision personal del Secretario. Lab. Inst. Med. Ava. v. Lab. C. Borinquen, 149 D.P.R. 121 (1999); Hosp San Pablo v. Hosp. Hnos. Meléndez, 123 D.P.R. 720, 732-733 (1989). Se trata de un proceso que’requiere la evaluación de muchas circunstancias y factores complejos y la ponderación de varios criterios diversos. Tal y como indica el Tribunal Supremo, de lo anterior es evidente que la decisión final del Secretario apareja el uso de su discreción. Id.
Este reconocimiento reglamentario de la discreción referida del Secretario merece nuestra deferencia por dos razones fundamentales. Por un lado, el Tribunal Supremo reiteradamente ha afirmado la norma doctrinal de que la interpretación que una agencia le de a su ley orgánica amerita gran respeto y consideración judicial Asoc Médica de P.R. v. Cruz Azul, 118 D.P.R. 669, 678 (1987); Tormos & DACO v. F.R. Technology, 116 D.P.R. 153, 160 (1985); Quevedo Segarra v. J.A.C.L., 102 D.P.R. 87, 96 (1974). Por otro lado, una interpretación contextual de la Ley Núm. 2 referida claramente revela que, en efecto, el legislador dejó en manos del Secretario la determinación de conceder o denegar los certificados requeridos, sujeto a unas guías y criterios, *1162 que aparejan un ámbito de discreción. Lab. Inst. Med. Ava. v. Lab. C. Borinquen, supra.
Dentro de las facilidades incluidas en la Ley Núm. 2, supra, que deberán tramitar un CNC cuando adquieran equipos altamente especializados están las facilidades radiológicas. Conforme a la referida legislación, están incluidas las instalaciones dedicadas al diagnóstico de enfermedades mediante el uso de rayos X, sonografía, tomografía computarizada o cualquier otro equipo similar de procedimiento invasivo. 24 L.P.R. A. see. 334.
B
La doctrina de academicidad es una de las expresiones concretas de principio de justiciabilidad, la cual delimita el ámbito de la función judicial. Crespo Rivera v. Cintrón Rivera, 159 D.P.R. — (2003), 2003 J.T.S. 66; C.E.E. v. Depto. de Estado, 134 D.P.R. 927, 934 (1993). Un caso es académico cuando, por el paso del tiempo, cambios fácticos o judiciales acaecidos durante el trámite en el tribunal causan que éste pierda su carácter adversativo, de manera que un dictamen judicial constituiría una opinión consultiva. Rullán v. Fas Alzamora, 166 D.P.R. _ (2006), 2006 J.T.S. 12; Cruz v. Adm. de Corrección, 164 D.P.R. — (2005), 2005 J.T.S. 39; Crespo Rivera v. Cintrón Rivera, supra; Emp. Pur. Des., Inc. v. H.I.E.T.E.L., 150 D.P.R. 924, 936 (2000); Angueira v. J.L.B.P., 150 D.P.R. 10, 19 (2000); Noriega v. Hernández Colón, 135 D.P.R. 406, 421-422(1994).
Al examinar la academicidad de un caso, es necesario que analicemos los eventos acontecidos, coetáneos y posteriores, de manera que podamos determinar si su circunstancia de controversia viva y presente perdura durante el transcurso de todo el trámite judicial. Rullán v. Fas Alzamora, supra; Cruz v. Adm. de Corrección, supra; Pres, del Senado, 148 D.P.R. 737, 759 (1999); C.E.E. v. Depto. de Estado, supra, pág. 935.
La doctrina de academicidad trata, pues, de evitar que los tribunales pierdan tiempo y recursos en resolver casos que no tendrán efectos prácticos sobre las partes. C.E.E. v. Depto. de Estado, supra, págs. 935-936, E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958). En consideración a lo anterior, nuestro Tribunal Supremo ha expresado que, como regla general, una vez se determina que un caso es académico, por haber desaparecido el carácter adversativo entre los intereses de las partes involucradas, los tribunales deben abstenerse de considerarlo en sus méritos. C.E.E. v. Depto. de Estado, supra, pág. 936. Nuestro más alto foro ha sido claro en que la controversia entre las partes debe existir “durante todas las etapas de un procedimiento adversativo, incluyendo la etapa de apelación o revisión”. (Énfasis Suplido); Noriega v. Hernández Colón, 135 D.P.R. 406, 437 (1994), citando a DeFunis v. Odegaard, 416 U.S. 312 (1974).
Como mencionáramos, al considerar el concepto de academicidad, hay que concentrarse en la relación existente entre los eventos pasados que dieron inicio al pleito y la adversidad presente, absteniéndonos de considerar un caso en sus méritos cuando este se ha tornado académico. Sin embargo, en reiteradas oportunidades, nuestro Tribunal Supremo ha reconocido que existen excepciones ante las cuales los tribunales pueden atender un caso que podría estimarse académico. Éstas son: a) cuando se plantea una cuestión recurrente que por su naturaleza hace muy difícil dilucidarla nuevamente en los tribunales; b) cuando la situación de hechos ha sido cambiada por el demandado, pero no tiene visos de permanencia; c) cuando el caso es aparentemente académico, pero en realidad no lo es por sus consecuencias colaterales, y d) cuando el tribunal ha certificado un pleito de clase y la controversia se tomó académica para un miembro de la clase, mas no para el representante de la misma. Rullán v. Fas Alzamora, supra; P.N.P. v. Carrasquillo, 166 D.P.R. _ (2005), 2005 J.T.S. 162; Cruz v. Adm. de Corrección, supra; Noriega v. Hernández Colón, supra, págs. 438-439.
C
Reiteradamente, nuestro más Alto Foro ha resuelto que las decisiones de los organismos administrativos merecen la mayor deferencia judicial. Esta deferencia se debe a que son éstos los que cuentan con el conocimiento experto y con la experiencia especializada de los asuntos que les son encomendados. Mun. de San *1163 Juan v. Plaza Las Américas, 169 D.P.R. _ (2006), 2006 J.T.S. 164; López v. Administración, 168 D.P.R. _ (2006), 2006 J.T.S. 146; Hernández v. Centro Unido, 168 D.P.R. _ (2006), 2006 J.T.S. 140; Comisionado de Seguros v. Puerto Rican Insurance Agency, 168 D.P.R. _ (2006), 2006 J.T.S. 142; Martínez v. Rosado, 165 D.P.R. _ (2005), 2005 J.T.S. 132; Polanco v. Cacique Motors, 165 D.P.R. _ (2005), 2005 J.T.S. 101; Otero v. Toyota, 163 D.P.R. _ (2005), 2005 J.T.S. 13; Rebollo Vda. de Liceaga v. Yiyi Motors, 161 D.P.R. _ (2004), 2004 J.T.S. 4; Pacheco Torres v. Estancias de Yauco, 160 D.P.R. _ (2003), 2003 J.T.S. 150.
Al momento de revisar una decisión administrativa, el criterio rector para los tribunales será la razonabilidad en la actuación de la agencia. López v. Administración, supra; Camacho v. A.A.F.E.T., 168 D.P. _ (2006), 2006 J.T.S. 97; Rebollo Vda. de Liceaga v. Yiyi Motors, supra. Los tribunales no deben intervenir o alterar las determinaciones de hechos de un organismo administrativo, si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad. López v. Administración, supra; Martinez v. Rosado, supra; Polanco v. Cacique Motors, supra; Otero v. Toyota, supra; Pacheco Torres v. Estancias de Yauco, supra; Domínguez Talavera v. Caguas Expressway Motors, Inc., 148 D.P.R. 387, 397 (1999).
Ahora bien, en cuanto a la deferencia judicial antes aludida, la misma no debe concederse cuando el tribunal revisor se encuentra ante una interpretación estatutaria de la agencia administrativa que afecta derechos fundamentales, resulta irrazonable o conduce a la comisión de una injusticia. Martínez v. Rosado, supra; Costa, Piovanetti v. Caguas Expressway, 149 D.P.R. 881 (1992).
IV
En su escrito, el Hospital Ashford nos plantea que al decretar la desestimación de la querella, el Departamento de Salud ignoró la evidencia sobre información falsa o incorrecta a base de la cual el Centro Tomográfico obtuvo la reubicación del CNC 04-078. Sostuvo, entre otras cosas, que el Centro Tomográfico no podía solicitar la reubicación de un CNC para la prestación de servicios de CT que no le pertenecía.
Por su parte, el Centro Tomográfico alegó que el Hospital Ashford en ningún momento impugnó el hecho de que [el Centro Tomográfico] pudiera brindar los servicios de PET/CT. Señaló además, que en el caso no era de aplicación ninguna de las excepciones de la doctrina de academrcidad, por lo que debía confirmarse la determinación del Departamento de Salud.
En este caso resulta relevante la determinación emitida por este Tribunal en el caso Centro Tomográfico de Puerto Rico, Inc. v. Departamento de Salud, KLRA-2004-00891. En esta sentencia, el TA ordenó al Departamento de Salud expedir al Centro Tomográfico el CNC según fue solicitado. En virtud de dicha orden, el 7 de diciembre de 2006, el Departamento de Salud expidió el CNC 05-039 mediante el cual autorizó al Centro Tomográfico a operar equipo de diagnóstico PET/CT (tomografía por emisión de positrones y CT).
No cabe la menor duda de que en virtud del CNC referido, el Centro Tomográfico quedó autorizado para ofrecer los servicios de CT en sus nuevas facilidades. Ante dicha situación, los planteamientos del Hospital Ashford, que requieren se investigue la facultad del Centro Tomográfico para reubicar equipo de CT y operar el mismo, se toman académicos. Vease Rullán v. Fas Alzamora, supra; Cruz v. Adm. de Corrección, supra; Crespo Rivera v. Cintrón Rivera, supra; Emp. Pur. Des., Inc. v. H.I.E.T.E.L., supra; Angueira v. J.L.B.P., supra; Noriega v. Hernández Colón,
En cuanto al insistente planteamiento del Hospital Ashford de que el CNC 92-129 no le pertenecía al Centro Tomográfico, entendemos que no le asiste la razón. En el CNC 92-129 se autorizó al Centro Tomográfico a adquirir un equipo diagnóstico de imágenes por resonancia magnética ubicado en el Hospital Ashford, en la Ave. Ashford #1451. Claramente se desprende de dicho CNC que el dueño es el Centro Tomográfico, no el Hospital Ashford.
*1164 Somos de opinión que actuó correctamente el Departamento de Salud al desestimar por académica la querella presentada por el Hospital Ashford.
Tratándose de que las determinaciones de los organismos administrativos cuando se fundamentan en una base racional merecen la mayor deferencia judicial, es que procede la confirmación del dictamen recurrido. Véase López v. Administración, supra; Martínez v. Rosado, supra; Polanco v. Cacique Motors, supra; Otero v. Toyota, supra; Pacheco Torres v. Estancias de Yauco, supra; Domínguez Talavera v. Caguas Expressway Motors, Inc., supra.
V
Por los fundamentos antes expuestos, se confirma la resolución emitida por la Secretaría Auxiliar para Reglamentación y Acreditación de Facilidades de Salud del Departamento de Salud.
Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIO 2007 DTA 60
1. Los equipos de PET/CT se utilizan para la proyección de imágenes donde se combinan los beneficios ofrecidos por la tomografía por emisión de positrones con la tomografía computadorizada. Se utilizan para diagnóstico de cáncer, desórdenes neurológicos y enfermedades del corazón.