TEXTO COMPLETO DE LA SENTENCIA
Mediante sentencia emitida el 18 de octubre de 2000 y notificada el día siguiente, el Tribunal de Primera Instancia, Sala Superior de San Juan, por voz de la Hon. Dora T. Peñagarícano Soler, dictaminó que había actuado erróneamente la Comisión Estatal de Elecciones (en lo sucesivo la CEE) al resolver que el Municipio de San Juan (en adelante el Municipio) violó el Artículo 8.001 de la Ley Electoral, 16 L.P.R.A. see. 3351.
El 13 de enero de 2000, el Municipio realizó una actividad en el Coliseo Roberto Clemente, en la cual presentó un video en el que aparece en nueve (9) ocasiones la alcaldesa de San Juan, Hon. Sila M. Calderón.
No está en controversia que el referido video fue producido con fondos públicos del Municipio, quien consideró que no era necesario presentarlo a la previa aprobación de la CEE porque su proyección en la mencionada actividad no constituia una actividad de difusión pública.
El 18 de enero de 2000, el representante del Partido Nuevo Progresista ante la Junta de Anuncios de la CEE, presentó una solicitud de investigación, en la que adujo "que la alcaldesa del Municipio de San Juan, Hon. Sila M. Calderón, el día 13 de enero de 2000 llevó a cabo una actividad en el Coliseo Roberto Clemente para celebrar el tercer aniversario de su toma de posesión como alcaldesa". Alegó, además, "que en dicho evento en el que había dos pantallas gigantes, pasó y se difundió información sobre los logros de su administración" y agregó "que para incurrir en los gastos de difusión de dichas pantallas, era requerido (sic) la autorización de la Comisión Estatal de Elecciones". Sostuvo que "la difusión realizada por dichas pantallas gigantes se llevaron a cabo en violación de las disposiciones del Artículo 8.001 de la Ley Electoral de Puerto Rico, así como del Reglamento para el Control de Gastos de Difusión Publica del Gobierno para las Elecciones Generales del 2000, aprobado el 10 de diciembre de 1999", sin contar con la previa aprobación de la CEE.
La Junta Examinadora de Anuncios, en lo sucesivo la Junta, consideró la solicitud de investigación durante dos reuniones celebradas el 10 de marzo y el 3 de mayo de 2000, en las cuales los representantes de los partidos *793 ante la Junta no lograron un consenso sobre las cuestiones planteadas, por lo que, de conformidad con la sección 2.4 del Reglamento, le correspondió al representante del Presidente de la Junta decidir la controversia.
El 8 de mayo de 2000, la Junta rindió un informe suscrito por su Presidente, el Hon. Angel Hermida, en el que se recomendó a la CEE que determinara que los peticionarios habían violado la Ley Electoral, supra, y recomendó como remedio, que se le requiriera a dicha Alcaldesa que, de sus fondos particulares, reembolse a las arcas municipales el costo total de producir dicho video. El Informe en cuestión, carece de determinaciones de hechos y de derecho separadas y numeradas. Reproducimos a continuación su parte analítica y dispositiva:
“No habiendo unanimidad entre los representantes de los partidos ante la Junta, y en virtud de lo dispuesto en la sección 2.4 de su Reglamento, le corresponde al presidente de la Junta el decidir cuál debe ser la recomendación de ésta. Luego de examinar detenidamente el video, y considerar, tanto los planteamientos hechos por los abogados del Municipio como las opiniones expresadas por los representantes de los partidos, el presidente que suscribe este Informe recomiendo (por los fundamentos que se expresarán en detalle infra) que se determine que al difundir el video que nos ocupa ante miles de empleados municipales, sin solicitar la autorización previa de la CEE para tal difusión, el Municipio incurrió en una violación al artículo 8.00 de la Ley electoral; y que como consecuencia de ello, se debe requerir a la Hon. Sila M. Calderón, Alcaldesa de San Juan, que reembolse a las arcas municipales el costo total de la producción de dicho video. ”
El artículo 8.001 de la Ley electoral prohíbe que durante un año en que se celebran elecciones (como lo es el año en curso) las agencias incurran en gastos en los medios de difusión pública para "exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes." Los propósitos de esa prohibición son bien conocidos: impedir que en años de elecciones se usen fondos públicos para (entre otras cosas) promover las imágenes de las agencias o de sus funcionarios, ayudando de esa forma (directa o indirectamente) la campaña política del partido en el poder. Como excepción a la anterior prohibición, el propio artículo permite "aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia", siempre y cuando se obtenga para ello la aprobación previa de la Comisión Estatal de Elecciones (CEE). Por tanto, antes de acudir a los medios de difusión durante el presente año, las agencias gubernamentales tienen que someter el anuncio a ser difundido al escrutinio de la CEE, y (por delegación de la CEE), a la Junta Examinadora de Anuncios.
Al hacer una determinación sobre qué tipo de difusión requiere solicitar esa aprobación, es necesario tener en mente que tanto la jurisprudencia de nuestro Tribunal Supremo como el Reglamento para el control de gastos de difusión pública del gobierno (aprobado por la CEE el 10 de diciembre de 1999), han reconocido que se debe dar una interpretación amplia al alcance del artículo 8.001. Así, el referido Reglamento, en su sección 1.4(8), define "medios de difusión" para incluir en el concepto "la radio, cine, televisión, periódicos, revistas, publicaciones periódicas, hojas sueltas, rótulos, símbolos, emblemas, fotografías, grabaciones, ya sean en cintas, discos, discos compactos y otros, internet, y cualquier otro medio capaz de difundir, propagar, y divulgar un mensaje, sea de forma directa o indirecta." En igual actitud, el Tribunal Supremo reconoció en Miranda v. CEE, 141 D.P.R. _, op. de 25 de octubre de 1996, 96 J.T.S. 137, que la veda de anuncios del artículo 8 aplica no sólo a anuncios tradicionales, sino también a una estrella de gran tamaño sobre los edificios centrales del Departamento de Educación, y a rótulos frente a los diversos edificios (incluyendo escuelas) de dicho Departamento, repitiendo con aprobación lo señalado por la sentencia del Tribunal Superior en dicho caso al efecto de que, para fines de la prohibición de anuncios del artículo 8.001, "anuncio debe entenderse en su sentido más general y amplio". La misma opinión en Miranda hace una lista de las muchas cosas que el propio Tribunal Supremo ha reconocido como "anuncios", no sólo a los fines de la veda de anuncios de la Ley Electoral, sino también a los fines de darle validez a los principios constitucionales en que dicha veda se inspira: pegatinas ("bumper stickers"), rótulos, zafacones con emblemas, y anuncios en postes, en el centro de una cancha municipal, en los vehículos oficiales, en el timbre del papel oficial de un municipio, y en camisetas.
A la luz de lo anterior, el presidente de la Junta Examinadora de Anuncios que suscribe este Informe entiende que es inaceptable la explicación ofrecida por el Municipio, de que no sometió este video en una solicitud de autorización a la CEE, antes de difundir el mismo en una actividad en la que participaban los varios miles de *794 empleados del Municipio, porque consideró que ello no era necesario. El rechazo de esa explicación depende de que esa actividad fuera una reunión oficial de trabajo o que fuera una celebración de un aniversario, como tampoco depende de que la misma estuviera o no estuviera abierta al público general. Distinto a lo que pudiera ser la regla si la difusión se hubiere efectuado en forma verdaderamente privada (por ejemplo, ante un grupo limitado a los funcionarios de confianza de la Alcaldesa), una difusión ante todos los empleados de un municipio, se debe considerar como una "difusión pública" cubierta por el artículo 8.001 de la Ley Electoral, aun cuando no hubiesen estado presentes miembros del mucho más amplio "público general".
El comportamiento del Municipio en este caso es aún más censurable por motivo de que el video, de haber sido sometido a la Junta antes de su difusión, no hubiese sido aprobado por ésta. El video, que como se dijo, supra, no tiene narración alguna, y cuya parte auditiva consiste sólo de un trasfondo musical, tampoco incluye texto alguno en la parte visual, fuera del título que aparece cuando comienza y de nuevo cuando termina: "apretando el paso - Municipio de San Juan", junto con el escudo del Municipio. Las imágenes visuales del video son de diversas personas sin identificar llevando a cabo múltiples actividades, y entre otras cosas aparecen en el video gente en la calle sembrando árboles, en diversos salones de clase, en una parada, en grupo bailando en un gran número de diversas actividades deportivas, en diferentes oficinas, en diferentes partes de lo que podría ser un hospital o un centro médico, en diversas obras de construcción en grupos, cantando, lavando una acera con una manguera de presión, pintando una verja, en muchas diferentes escenas de niños jugando, en una tarima tocando música y cantando, todas esas escenas entremezcladas sin que se pueda percibir ningún patrón lógico en la secuencia, y (excepto por el título que aparece al principio y al final, y que menciona al Municipio de San Juan) sin que haya nada que identifique todo esto con el Municipio, ni con sus empleados.
En toda esa enorme madeja de imágenes visuales, aparentemente inconexas, hay una sola cosa que se repite, intercalada periódicamente desde el principio hasta el fin del video. La Alcaldesa de San Juan aparece nueve veces separadas en el mismo: (1) entregando una placa, (2) cortando una cinta en lo que parece ser algún tipo de inauguración, (3) en una reunión alrededor de una mesa, con ella a la cabeza de la mesa, (4) conversando al aire libre con un pequeño grupo de personas, (5) dando un beso a una señora que le entrega una flor, (6) dando la mano a un señor en un proyecto de constmcción, (7) inspeccionado unos gabinetes de cocina, (8) abrazando a un niño, frente a un grupo de otros niños, y (9) pateando una bola en un campo deportivo.
Resulta de lo anterior que el verdadero problema del video no es que el mismo resalta logros de la actual administración municipal de San Juan. En la inmensa mayoría de las imágenes del video no hay nada que las identifique con San Juan, ni con sus empleados, e igual hubiesen podido ser grabadas dichas imágenes en facilidades públicas o privadas de cualquier otro municipio en Puerto Rico. El verdadero e insuperable problema del video es que su único foco es la persona de la Alcaldesa, y que el mismo no tiene ningún propósito discernible que no sea el de realzar la figura de ésta. Teniendo en cuenta que la Alcaldesa de San Juan es la actual candidata a la gobernación del Partido Popular Democrático, partido que ella también preside, el video que nos ocupa ilustra lo que no se puede hacer con fondos públicos mientras esté en vigor la veda de anuncios del artículo 8.001 de la Ley Electoral. Si hay algo que ese artículo sin duda prohíbe, es el que se usen fondos del erario para realzar las figuras de candidatos políticos. Resulta clara la violación por parte del Municipio de San Juan al artículo 8.001 de la Ley Electoral, al difundir este video ante miles de empleados municipales durante la actividad del 13 de enero de 2000 en el Coliseo Roberto Clemente, sin haberlo sometido antes a la consideración de la CEE mediante la correspondiente solicitud de autorización. Es del todo inaceptable la explicación ofrecida de que el Municipio consideró que ese trámite no era necesario porque esa actividad era una actividad oficial de trabajo. En vista de todo lo anterior, y como la persona que resultó beneficiada por la difusión del video lo fue la Hon. Sila M. Calderón, quien resulta ser precisamente al Alcaldesa del Municipio que produjo y difundió el mismo, el presidente de la Junta Examinadora de Anuncios que suscribe este Informe recomienda como remedio apropiado que la CF.F. le requiera a dicha Alcaldesa que, de sus fondos particulares, reembolse a las arcas municipales el costo total de producir dicho video. Se somete el presente Informe a la Comisión Estatal de Elecciones como la recomendación de dicha Junta.
El 19 de junio de 2000, la CEE notificó al Municipio que había aprobado el informe presentado por la Junta.
*795 Inconforme con el referido dictamen, el Municipio presentó un recurso de revisión ante el Tribunal de Primera Instancia, Sala Superior de San Juan, en el cual alegó, en síntesis, que erró la CEE al:

“...concluir que un video presentado en una actividad interna de un municipio y en la cual no hubo acceso al público o difusión general, requería la autorización de la Comisión.

...al imponer una sanción monetaria a un funcionario municipal por una alegada violación a la Ley Electoral, sin existir autoridad en ley para ello. ”

El 22 de junio de 2000, la CCE presentó su oposición al recurso. Tras algunos trámites procesales, el Municipio presentó "Moción en solicitud de sentencia parcial" en la cual solicitó se tomara conocimiento judicial de la Sentencia emitida el 24 de agosto de 2000 en el caso de Municipio de Las Marías et ais. v. Comisión Estatal de Elecciones, Civil Núm KEOO-1669 (904) y que, en su consecuencia, se dictara sentencia parcial a favor del Municipio y se revocara la sanción monetaria impuesta por la CEE a la Sra. Alcaldesa de San Juan. El tribunal le concedió a la CCE un término de cinco (5) días para que expusiera su posición frente a la referida moción. La CEE compareció en el término concedido y expresó "que en relación a la solicitud del Municipio de San Juan de sentencia parcial, lo resuelto en Municipio Las Marías v. CEE, KPE-00-1669, ya es final y firme". El 22 de septiembre de 2000, el tribunal de instancia accedió a lo solicitado y dictó sentencia parcial a favor del Municipio y revocó la sanción impuesta por la CEE, la cual es ya final y firme.
Recibida la prueba testifical y documental presentada por las partes durante el juicio de novo celebrado al amparo del Artículo 1.017 de la Ley Electoral, 16 L.P.R.A. See. 3016 (b), el foro recurrido dictó la sentencia objeto del recurso del título, en la cual formuló las siguientes:

“DETERMINACIONES DE HECHOS

1- El 13 de enero de 2000, el Municipio de San Juan realizó una actividad en el Coliseo Roberto Clemente, en la cual los invitados eran los empleados del mencionado municipio. En dicha actividad no hubo acceso al público en general.

2- En la mencionada actividad, se presentó un video de dos minutos y medio de duración en donde aparece en varias ocasiones la Alcaldesa de San Juan, Hon. Sila M. Calderón, junto a diversos empleados municipales.

3- La actividad realizad, respondió al interés del Municipio de San Juan en promover la motivación de los empleados, conforme a la Teoría de Gerencia Moderna implantada por el Municipio.

4- Esta nueva política pública se implantó en el Municipio de San Juan en 1998, año en que se celebró la primera actividad de este tipo. En dicha actividad se presentó un video similar al que nos ocupa, pero con duración de siete (7) minutos aproximadamente.

5- La Oficina de Asuntos Públicos del Municipio de San Juan fue la que tuvo a cargo la preparación del video presentado en la actividad del 13 de enero de 2000. Dicha oficina refiere la documentación preparada por ésta, a la Oficina Legal del Municipio de San Juan para que se determine si éstos requieren la aprobación de la CEE.

6- Tanto el personal de la Oficina de Asuntos Municipales, como de la Oficina Legal, fueron adiestrados por la CEE en cuanto a cómo funcionaba la veda electoral. En este adiestramiento, nunca se orientó deforma oral o escrita si las actividades internas que llevan a cabo las agencias e instrumentalidades públicas están sujetas a la veda electoral.

7- El video en controversia fue preparado, luego de haber recibido el adiestramiento de la CEE.

*796
8- El video en cuestión, el cual fue costeado con fondos públicos, no fue presentado a la CEE por entender la parte peticionaria que la proyección del video en la mencionada actividad no constituía un medio de difusión pública, ya que la misma era en el contexto y como parte de una actividad privada.

9- Así las cosas, el representante del Partido Nuevo Progresista ante la Junta de Anuncia de la CEE, presentó una solicitud de investigación, en la que expresó que la Alcaldesa del Municipio de San Juan había llevado a cabo una actividad en el Coliseo Roberto Clemente para celebrar el tercer aniversario de su toma de posesión como alcaldesa. Alegó que en dicho evento se presentó un video en el cual se difundió información sobre los logros de su administración sin contar con la previa aprobación de la CEE. Sostuvo que la difusión efectuada fue realizada en violación a lo dispuesto en el Artículo 8.001 de la Ley Electoral, supra.

10-La Junta Examinadora de Anuncios consideró el asunto durante reuniones celebradas el 10 de marzo y 3 de mayo de 2000. En dichas reuniones, hubo disparidad de criterio entre los representantes de los partidos ante la Junta Examinadora de Anuncios en cuanto a qué acción se debía tomar. Al no haber unanimidad entre los representantes de los partidos, de conformidad con la sección 2.4 del Reglamento, le correspondió al representante del Presidente de la Junta decidir, mediante su voto, la controversia presentada.

11- El 8 de mayo de 2000, la Junta Examinadora de Anuncios rindió un informe suscrito por su Presidente Ledo. Angel Hermida, en el cual determinó que la parte peticionaria había violado la Ley electoral, supra, y recomendó como remedio, el que se le requiriese a la Alcaldesa de San Juan, reembolsar a las arcas municipales el costo de producir el documento que nos ocupa.

12- El 19 de junio de 2000, la CEE notificó a los peticionarios que había aprobado el informe presentado por la Junta Examinadora de Anuncios y informándoles, a su vez, el término que tenía para recurrir ante el Tribunal de tal determinación. ”

El Tribunal de Primera Instancia arribó, además a las siguientes:

“CONCLUSIONES DE DERECHO

1- El artículo 8.001 de la Ley Electoral vigente, supra, dispone lo siguiente:

Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de la celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición, aquellos avisos y anuncios de prensa expresamente requeridos por ley.

Asimismo, se exceptúan de la anterior disposición, aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencias, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. ’

2- Conforme los poderes conferidos a la CEE por la Ley Electoral, supra, el 10 de diciembre de 1999, se aprobó el Reglamento para el Control de Gastos de Difusión Pública del Gobierno, Elecciones Generales 2000. El mismo tiene como propósito, el reglamentar la prohibición establecida por el Artículo 8.001 de la Ley Electoral, supra, a los fines de evitar la divulgación publicitaria que tenga el propósito de exponer programas, proyectos, logros, realizaciones, proyecciones o planes, lemas o expresiones proselitista (sic) o frases procedentes de campañas políticas que en alguna forma coaccionen o afecten la voluntad de los electores.

3- De conformidad con el Artículo 8.001, supra, todo anuncio gubernamental que se pretenda difundir durante el año electoral, excepto los excluidos expresamente por ley, debe someterse a la autorización previa de *797 ia CEB. C.E.E. v. Departamento de Estado, 134 D.P.R., 927, a la págs. 940 y 941 (1993).

4- El Reglamento, en su sección 1.4, define medios de difusión como "la radio, cine, televisión, periódicos, revistas, publicaciones periódicas, hojas sueltas, rótulos, símbolos, emblemas, fotografías, grabaciones, ya sean en cintas, discos compactos u otros, internet y cualquier otro medio capaz de difundir, propagar y divulgar un mensaje, sea deforma directa o indirecta.

5- El Tribunal Supremo ha interpretado con amplitud la expresión medios de difusión. Dicho Tribunal ha reconocido toda una gran gama de posibilidades que pueden crease o adaptarse para llevar mensajes publicitarios de índole partidista. Se ha incluido como anuncios a los fines del Artículo 8.001: pegadnos, rótulos, zafacones con emblemas, anuncios en los postes, en el centro de una cancha municipal, en los vehículos oficiales y en el timbre del papel oficial del municipio y en camisetas. Miranda v. Comisión Estatal de Elecciones, 96 J.T. S. 137; P.P.D. v. Rosselló González II, 96 J.T.S. 165.
6- La disposición en cuestión refleja el interés en descontinuar durante el período eleccionario la práctica de las agencias gubernamentales de hacer campaña política mediante la publicación sobre sus logros y planes. C.E. E. v. Departamento de Estado, supra; Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 393 (1984). Para asegurar que se logre esta clara intención legislativa, estamos compelióos a interpretar el alcance del Artículo 8.991, supra, de modo tal que prevalezca la importante política pública que lo inspira. C.E.E. v. Departamento de Estado, supra.
7- Esta prohibición veda aquellos anuncios y publicaciones que directa o indirectamente, de una u otra forma, enaltecen o divulgan las ejecutorias del gobierno. Lo que se persigue es excluir definitivamente del proceso político partidista la influencia solapada que el partido en poder puede tener mediante el uso de los anuncios gubernamentales. Coss v. Comisión Estatal de Elecciones, 95 J.T.S. 15. Romero Barceló v. Hernández Agosto, supra. De la misma forma, se trata de evitar que el Estado, mediante anuncios gubernamentales pueda tener influencia en la libre expresión de los ciudadanos en la votación, con el poder económico que éste tiene mediante la utilización de fondos públicos. P.P.D. v. Rosselló González I, 94 J.T.S. 117, a las págs. 132 y 133.
8- Desde sus comienzos, su propósito fue prohibir la utilización de fondos públicos para hacer campaña política. Este principio a su vez responde al postulado de igualdad económica inmerso en nuestra Constitución que persigue lograr paridad económica entre los partidos políticos. Miranda v. CEE, supra, a la pág. 237; Marrero v. Municipio de Morovis, 115 D.P.R. 643 (1984).
9- El concepto de igualdad económica con relación a la distribución de fondos públicos en el proceso electoral, impide que un partido que ostente el poder de gobernar al pueblo, en un momento dado utilice fondos públicos, tomando ventaja indebida para promover su postura. El Artículo 8.001 es precisamente una medida preventiva para que dicha práctica no ocurra. Miranda v. CEE, supra; P.P.D. v. Rosselló González I. supra, a la pág. 132.
10- El Tribunal Supremo expresó que "en la medida en que se subvencione una campaña político-partidista con fondos públicos, se le permite una ventaja a un partido político (o candidato político) sobre otros, que atenta contra el axioma de igualdad electoral y socava los pilares del esquema electoral en nuestro País, el cual garantiza la igualdad económica entre los partidos sin limitarlo al período eleccionario. P.P.D. v. Rosselló González II, 95 J.T.S. 165, a la pág. 429.
11- Por su parte, el artículo II, Sección 2, de la Constitución del Estado Libre Asociado de Puerto Rico consagra el principio básico de que el poder político emana del consentimiento y voluntad popular, imponiendo al Gobierno una responsabilidad dual: la de abstenerse, por un lado, de interferir con el ejercicio del sufragio universal, igual, directo y secreto, y por otro, la de proteger al ciudadano contra toda coacción en el ejercicio de tal prerrogativa electoral. Id. Véase, además, P.P.D. v. Rosselló González I, supra, y Sánchez v. E.L.A., 134 D.P.R. 445 (1993).

*798
12- Cuando se utilizan fondos públicos para promover la postura de determinado partido, se afecta detrimentalmente el derecho de los electores a ejercer su voto libre de cualquier coacción. P.P.D. v. Rosselló Conzález II, supra, a la pág. 439.

13- Para evitar que se frustre la expresión pura y libre de los votantes y se le otorgue una ventaja indebida a la posición del partido de tumo en el gobierno, resulta inminentemente necesaria la neutralidad de las acciones del Gobierno en el proceso electoral. Lo contrario, atentaría contra la integridad básica del proceso democrático.

14- Analizada la controversia de autos, bajo el crisol doctrinario previamente esbozado, concluimos que el Municipio de San Juan no violentó la prohibición establecida por la Ley Electoral, supra. Veamos. A pesar de que resulta indubitado que el video en cuestión es un medio de difusión, su presentación fue en el contexto de una actividad intema del Municipio de San Juan, por lo que la misma constituye una difusión privada, no contemplada en la Ley Electoral, supra, ni el Reglamento. ”

Inconforme con el dictamen del Tribunal de Primera Instancia, el 27 de octubre de 2000, la CEE acude ante nos y solicita su revocación aduciendo que: "[EJrró el Tribunal de Primera Instancia al concluir que actividades privadas o internas de los municipios no están sujetas a las limitaciones del Art.8.001 de la Ley Electoral durante año de elecciones, y que no existe precedente jurisprudencial para así determinarlo".
El 30 de octubre de 2000 emitimos la resolución que transcribimos textualmente a continuación:

“La Regla 48 del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A., Ap. XXII-A, R. 48, provee que cuando la notificación del escrito de certiorari fuera a ser efectuada durante los treinta (30) días anteriores a un evento eleccionario, la misma se efectuará sólo personalmente o mediante fax, y siempre mediante notificación por teléfono. ”

En la solicitud de certiorari ante nos, la parte peticionaria certificó haber enviado copia de dicha solicitud a los abogados de la parte recurrida, pero no acreditó la notificación mediante entrega personal.
Mediante moción informando sobre notificación, radicada el mismo día de la presentación del recurso, la parte peticionaria certifica que notificó a la representación legal del municipio de San Juan por teléfono y "entregado copia por mensajero". Nos acompañó un anejo acreditativo de la notificación al Tribunal de Primera Instancia, pero omitió incluir información relativa a la forma y circunstancias del diligenciamiento de la notificación a la parte recurrida.

“Acredite, la parte peticionaria, en un término de veinticuatro (24) horas, bajo apercibimiento de desestimación, la forma y circunstancias del diligenciamiento de la notificación de la notificación a la parte recurrida. ”

De conformidad con lo dispuesto en la Regla 46 (A)(2) del Reglamento del Tribunal de Circuito de Apelaciones, supra, la parte recurrida deberá presentar su posición frente al recurso dentro del término de cinco (5) días siguientes a la notificación de la solicitud de certiorari.
Se ordena a la Secretaria General del Tribunal de Primera Instancia, Sala Superior de San Juan, que en el término de veinticuatro (24) horas remita a este Tribunal el expediente del caso KPE-2000-1429 (904).
Notifíquese inmediatamente vía facsímil, vía telefónica, además de por la vía ordinaria.
El 31 de octubre de 2000, la CEE cumplió con nuestro requerimiento. Ese mismo día se elevaron los autos originales del Tribunal de Primera Instancia. El 1 de noviembre de 2000, a las 4:40 p.m., el Municipio presentó su oposición al recurso. El 2 de noviembre de 2000, estudiamos el video en controversia, y el 3 de noviembre al *799 mediodía quedó sometido el recurso.
Examinados los escritos de las partes, el expediente original ante el tribunal recurrido, y la ley y la jurisprudencia aplicables, denegamos el auto de certiorari solicitado.
n
De entrada, es imperativo consignar que acogemos las determinaciones de hecho y las conclusiones de derecho del foro recurrido, anteriormente transcritas, y las incorporamos y las adoptamos por referencia.
La argumentación de la CEE sigue los lincamientos generales del informe del oficial examinador de la Junta, anteriormente transcrito, que no fueron avalados por el Tribunal de Primera Instancia, quien determinó que no existe precedente jurisprudencial en nuestra jurisdicción sobre la cuestión medular planteada en el recurso; es decir, si la Ley Electoral y el Reglamento, aprobado al amparo de la misma, exigen que se someta previamente a la consideración de la Junta de Anuncios una actividad interna de un municipio (como la que se llevó a cabo el 13 de enero de 2000) dirigida exclusivamente a sus empleados y encaminada a motivarlos, mediante programas modernos de desarrollo administrativo y gerencial.
Asimismo, el tribunal recurrido determinó correctamente que la alegada violación que se le imputa al Municipio no está tipificada ni en la Ley Electoral ni en el Reglamento para el Control de Gastos de Difusión Pública del Gobierno.
Definitivamente, acertó el Tribunal de Primera Instancia al resolver que no existe precedente jurisprudencial alguno que se pueda invocar con carácter normativo para la adjudicación de la controversia específica que se nos plantea. Ni el distinguido oficial examinador, ni la CEE, tan duchos en sus menesteres, adujeron que tal precedente exista. Aparte de su valor intrínseco persuasivo, las opiniones concurrentes no tienen el rango de doctrina jurisprudencial que los Tribunales de Primera Instancia y el Tribunal de Circuito de Apelaciones vengan obligados a obedecer. En otras palabras, brillan por su ausencia los casos que resuelvan que la prohibición del Artículo 8.001 de la Ley Electoral, supra, se aplica a la proyección de un video en una actividad interna y privada de un Municipio convocada exclusivamente para sus empleados con el propósito de adiestrarlos y motivarlos.
Conviene no pasar por alto cómo fue que se originó esta controversia. En la solicitud de investigación radicada por el representante del P.N.P. ante la Junta de Anuncios, se alegó que en dicha actividad se difundió información sobre los logros de su administración y que la actividad tenía el propósito de celebrar el tercer aniversario de la toma de posesión de la Alcaldesa.
En primer lugar, el video no presenta logro alguno de la administración municipal. El Oficial Examinador no señaló en su informe que el video reclamara logros de la administración. Por el contrario, se refiere al video, atinadamente, como "una enorme madeja de imágenes visuales aparentemente inconexas", y reconoce que "en la inmensa mayoría de las imágenes del video, no hay nada que las identifique con San Juan, ni con sus empleados, e igualmente hubiesen podido ser grabadas dichas imágenes en facilidades públicas o privadas de cualquier otro municipio de Puerto Rico". Tampoco la representación legal de la CEE ha señalado algún logro que muestre el video. Lo mismo podemos decir del Tribunal de Primera Instancia.
En segundo lugar, los autos están totalmente huérfanos de prueba de que uno de los propósitos de la actividad era celebrar el tercer aniversario de la toma de posesión de lá Alcaldesa. Ni el Honorable Oficial Examinador, ni el Tribunal de Primera Instancia concluyeron que esta imputación tuviese fundamento alguno. Agregúese a lo anterior, que la CEE no impuso sanciones al Municipio y que la única sanción impuesta a la alcaldesa fue revocada por el tribunal recurrido, mediante sentencia que es final y firme, y se comprenderá que el presente recurso participa de una naturaleza muy peculiar.
En la súplica del recurso, la CEE reconoce que no se puede imponer al Municipio sanción alguna y que su conducta quedará impune. En una curiosa súplica que linda con una solicitud para que emitamos una opinión *800 consultiva, la C.E.E. expresa que "...el Tribunal determine qué actividades internas con los empleados de municipios celebradas en año de elecciones están sujetas a la veda electoral".
Lo que nos corresponde resolver, realmente, es si a la luz de los hechos concretos probados en el caso de autos, en un juicio de novo, el video proyectado en la actividad del 13 de enero de 2000, violo la Ley Electoral y su Reglamento. Entendemos que no.
Hay claros e inequívocos indicios de que el video en cuestión, no sólo no fue preparado con el objetivo de llegar al público, sino que se tomaron todas las providencias imaginables para que no trascendiera el cerrado círculo de los empleados municipales que asistirían a la actividad. Esta conclusión está avalada por los siguientes hechos incontrovertibles:

“]) A la actividad fueron invitados y asistieron exclusivamente los empleados del Municipio de San Juan.

2) En la invitación cursada por la alcaldesa el 7 de enero de 2000 a la actividad, se hace referencia a una "sesión de trabajo anual con todos los compañeros municipales durante la cual tenemos un reconocimiento a todos los empleados del municipio que, como tu, laboraban con nosotros hasta hace poco cuando se acogieron a nuestro Programa de Retiro Temprano".

3) En la convocatoria circulada a todos los empleados del Municipio de San Juan el 11 de enero de 2000, por la Sra. Yolanda Cordero, Directora de Recursos Humanos, se hace constar claramente y sin ambages, que:

(A) "En esta reunión se presentará el plan de trabajo del próximo año y además se reconocerá la labor de todos y cada uno de los empleados que afanosamente trabajan día a día para lograr nuestro objetivo de ofrecer servicios de calidad".

(B) "Es importante que aquellos empleados que utilicen uniforme para realizar sus trabajos diarios, hagan uso del mismo".

(C) "De igual forma, todos los empleados deberán utilizar su tarjeta de identificación".

(D) "Esta actividad es una reunión de trabajo, por lo que la asistencia es compulsoria, y el no asistir se considerará una ausencia”.

(E) "Todos los empleados se presentarán a sus respectivos lugares de trabajo en su horario regular. A las 8:30 a.m. deberán reportarse al Coliseo Roberto Clemente. Una vez allí, se aseguraran de registrar su asistencia al Coliseo en las Hojas de Asistencia que mantendrán los Oficiales de Personal de los respectivos departamentos y oficinas. Luego de finalizada la actividad, los trabajos se reanudarán como de costumbre".

(4) La agenda de la reunión es, sin lugar a dudas, la descripción de una sesión de adiestramiento, motivación y reconocimiento a los empleados. La Junta acepto que la agenda de la reunion no era un anuncio. Desde hace décadas, es lugar común y casi una perogrullada que los programas y sesiones de motivación a empleados y trabajadores son imprescindibles para lograr una mayor productividad y excelencia, tanto en las empresas públicas como privadas. Ni ante la Junta, ni ante el Tribunal de Primera Instancia se presento prueba de que alguno de los participantes en la actividad, en sus conferencias o alocuciones, hiciera alusión, directa o indirecta, a los logros del Municipio o los logros de la alcaldesa.

(5) El video no se utilizó antes de la actividad y nunca más se volvió a utilizar. ”

En ninguna de las etapas del trámite del caso que nos ocupa, ni al Partido Nuevo Progresista ni a la C.E.E., les fue posible producir un sólo testigo o pieza de evidencia que probara que el video trascendió los estrechos límites de la actividad del 13 de enero de 2000, ó de que en alguna de las fases de su concepción, producción y *801 proyección, el municipio tuviera la intención de que el público en general, o parte de él, tuviera acceso al mismo. Ese aspecto de difusión o divulgación al público en general, es un factor esencial, sin el cual queda tranco cualquier esfuerzo para que se configure una violación a la ley o al reglamento.
Es inadecuado, pues, comparar el video en cuestión con los periódicos y boletines internos de las agencias, ya que éstos, por su peculiar naturaleza, pueden fácilmente reproducirse, total o parcialmente, en grandes cantidades, por cualquiera de los empleados de la agencia o cualquier otra persona que los reciba de un empleado. En esos casos, son enormes las probabilidades de que el material se difúnda al público en general.
El rasgo distintivo de todos los medios de difusión a los cuales nuestro más Alto Foro ha extendido la prohibición de divulgación, es, precisamente, su potencial de convertirse en anuncios. Definitivamente, de esa naturaleza participan las pegatinas, rótulos, zafacones con emblemas, anuncios en los postes, en el centro de una cancha municipal, en los vehículos oficiales y en timbre del papel oficial del municipio y en camisetas. Miranda v. C.E.E., supra; Roselló González II, _ D.P.R. _ (1996), 96 J.T.S. 165.
A la luz de los hechos incontrovertidos antes reseñados, es imposible concluir que el video en cuestión constituye un medio de difusión pública que requería la previa aprobación de la Junta con anterioridad a su proyección en la actividad del 13 de enero de 2000.
III
Por los fundamentos expresados, se deniega el auto solicitado.
El Juez Negrón Soto emite voto concurrente por escrito. El Juez Negroni Cintrón emite voto disidente por separado.
Así lo pronunció y manda el Tribunal y lo certifica la Subsecretaría General.
Gladys E. Ortega Ramírez
Subsecretaría General
ESCOLIOS 2001DTA 46
1. En lo concerniente a las disposiciones citadas, el Tribunal Supremo de Puerto Rico en Miranda v. C.E.E., 96 J.T.S. 96 (1996), determinó que se trata de una revisión mediante juicio de novo, para io cual el tribunal tiene que celebrar vista en su fondo, recibir evidencia y hacer sus propias determinaciones de hechos y conclusiones de derecho. No se trata de una mera revisión limitada a cuestiones de derecho. En el juicio de novo es admisible prueba pertinente, aunque ésta no fuera presentada ante la CEE.
2. Ni qué decir, tendríamos que ambos documentos están muy bien concebidos y que, salvo las naturales discrepancias que son propias de nuestros difíciles menesteres y que, por ende, podamos tener con ambos, constituyen idóneas herramientas que facilitan nuestra función revisora. Lo mismo podemos decir respecto a los escritos ante nos de la CEE y el Municipio.
3. El video presenta ochenta y tres (83) secuencias. En ninguna de ellas se hace reclamo de logro alguno. En la abrumadora mayoría de ellas, se muestra a personas realizando su trabajo. En algunas de ellas, se puede identificar a empleados del Municipio de San Juan.
4. La Sec. 3.016 (a), de la Ley Electoral, supra, sobre Revisión de las decisiones de la Comisión, provee que cualquier parte afectada por una resolución, determinación y orden de la Comisión Estatal, podrá, dentro de los diez (10) días siguientes la notificación de. la misma, acudir ante el Tribunal Superior mediante la radicación de un escrito de revisión. La parte promovente tendrá la responsabilidad de notificar copia del escrito de revisión a la Comisión Estatal y a cualquier parte afectada. El Tribunal Superior celebrará una vista en su fondo, recibirá evidencia y formulará las determinaciones de hechos y conclusiones de derecho que correspondan. El Tribunal deberá resolver dicha revisión dentro de un término no mayor de veinte (20) días, contados a partir de la fecha de sometida la misma.
*802 "Al examinar esta disposición estatutaria, encontramos que se trata de una revisión donde los tribunales de instancia tendrán que efectuar un juicio de novo. Véase PNP v. Rodríguez Estrada., Pres. CEE, 123 D.P.R. 1, 31 (1988). Por lo tanto, vendrán obligados a celebrar vista en su fondo, recibir evidencia y hacer sus propias determinaciones de hechos y conclusiones de derecho al revisar las decisiones de la CEE. No se trata de una mera revisión limitada a cuestiones de derecho. Vélez Quiñones v. Srio. de Instrucción, 86 D.P.R. 755 (1962). "Miranda v. C.E.E. _ D.P.R. _ (1996), 96 J.T.S., 137 (1996).