El Juez Presidente Señor Hernández Denton
emitió la opi-nión del Tribunal.
Este caso nos brinda la oportunidad de pautar por pri-mera vez diversos aspectos de la normativa que regula la difusión de los anuncios gubernamentales en periodos de veda electoral. En particular, nos corresponde determinar el alcance de la frase “gastos para la compra de tiempo y espacio en los medios de difusión pública”, contenida en el Art. 8.001 de la Ley Electoral de Puerto Rico (Ley Electoral),(1) así como lo que configura la “situación extraordina-ria” que justifica difundir un anuncio o mensaje, sin aco-gerse previamente al procedimiento de autorización establecido a esos efectos.
I
El 23 de septiembre de 2004, la Asamblea Legislativa de Puerto Rico aprobó la Ley del Referéndum sobre el Sis-tema Cameral de la Asamblea Legislativa, que proveía para consultar al electorado puertorriqueño su preferencia en cuanto a cambiar la composición de nuestro sistema le-gislativo de bicameral a unicameral.(2)
En vista de ello, en febrero de 2005 la Comisión Estatal de Elecciones (C.E.E.) determinó que a la consulta le apli-caría lo dispuesto en el Art. 8.001 de la Ley Electoral.(3) A esos fines, la C.E.E. constituyó la Junta Examinadora de Anuncios, la cual estaría compuesta por un oficial exami-nador, en representación de cada partido político, y por un representante del Presidente de la C.E.E. La vigencia de la veda electoral se notificó a las tres Ramas del Gobierno y a *978 los municipios. Ésta se mantendría vigente desde el 1 de marzo de 2005 hasta el 11 de julio del mismo año.
En aras de implantar las disposiciones de la Ley Electoral, regular el procedimiento para solicitar autorización del uso de medios de difusión y facultar a la C.E.E. para investigar si algún anuncio difundido había obtenido auto-rización previa, la C.E.E. aprobó —antes de que la veda electoral entrara en vigor— el Reglamento para el Control de Gastos de Difusión Pública del Gobierno para el Refe-réndum de 10 de julio de 2005 (Reglamento).
El 31 de mayo de 2005, la Oficina del Gobernador emitió un comunicado de prensa mediante el cual anunció que, al día siguiente, el funcionario ofrecería un mensaje especial al pueblo de Puerto Rico que sería transmitido en vivo desde la Fortaleza. Se indicó que éste haría “unas expre-siones históricas ante la situación del país” y se dispuso que el mensaje podría ser transmitido por todos los medios de comunicación. En el comunicado se señaló que la trans-misión no tendría “ningún costo para el Estado Libre Aso-ciado de Puerto Rico”. Previo a la difusión del mensaje, el señor Gobernador no solicitó la autorización de la Junta Examinadora de Anuncios de la C.E.E.
El 1 de junio de 2005, el señor Gobernador transmitió el mensaje a través de una señal originada en el Departa-mento de Noticias del Canal 6. A esta señal se conectaron los Canales 2, 4 y 11 para retransmitirlo.
El texto del mensaje se reproduce, en lo pertinente, a continuación:
Hoy vengo a hablarte de la situación que atraviesa nuestro país y de cómo vamos a superarla. Est[á] bueno ya de que algunos políticos sigan retrasando tu progreso.
Basta ya de espectáculos.
En el Mensaje de Estado hice un llamado a que trabajemos juntos para enfrentar los problemas actuales y echar adelante a Puerto Rico. Presenté un plan que denominé el Triángulo del Éxito para combatir el crimen, poner la educación en el sitial que se merece y promover una nueva economía más fuerte, con más empleos.
Ya se empiezan a ver resultados; cortamos el gasto público, *979 logramos una reducción en la criminalidad, incluyendo los asesinatos; cambiamos las prioridades de nuestro sistema educativo, creamos el programa Apoyo al de Aquí para generar empleos y sometimos decenas de medidas legislativas y el pre-supuesto que están pendientes de aprobación.
Le he solicitado a la Legislatura que atienda responsable-mente el presupuesto y los he convocado a que nos sentemos a trabajar juntos por el bien de Puerto Rico.
Sin embargo, tú has visto que hay unos políticos que se han quedado en el pasado y se han dedicado a sus luchas de poder y no a trabajar por ti.
Tú sabes qui[é]nes son.
Aunque estamos viendo señales por parte de algunos legisla-dores que se han parado firmes, ya no se puede seguir apla-zando la acción y el trabajo que necesita Puerto Rico.
Está bueno ya.
Yo tengo un plan y en las próximas semanas lo estarás viendo en acción.
Como tu Gobernador, en el ejercicio de mis prerrogativas y poderes, estaré haciendo públicas una serie de órdenes y ac-ciones ejecutivas, para lo que no es necesaria la intervención de la Legislatura.
Estas acciones, entre otras, están dirigidas a darle los recur-sos que la Policía necesita; asignarle al Centro Médico los fon-dos que requiere urgentemente, al Departamento de Educa-ción para que mejore las condiciones de las escuelas, para atacar de frente la evasión contributiva y darle apoyo a las empresas de aquí. Todo esto antes del 30 de junio.
Para esa fecha Puerto Rico necesita que la Asamblea Legisla-tiva haya aprobado un presupuesto con los recursos para aten-der en el próximo año fiscal tus necesidades.
En un intento más por romper el tranque legislativo, mañana estaré anunciando la creación de un Comité Mediador Ejecu-tivo de Ciudadanos que tendrá la misión de mediar con la Asamblea Legislativa sobre el presupuesto. Invito a la Asam-blea Legislativa a crear un Comité similar.
La Asamblea Legislativa tiene que responder, pero si no lo hace, voy a utilizar todas las prerrogativas y poderes constitu-cionales que tengo como Gobernador para que el gobierno cumpla su misión y los fondos lleguen al pueblo, como tienen que llegar.
A los que quieran trabajar por Puerto Rico va mi respeto y mi voluntad de cooperación, aun cuando existen diferencias ideo-lógicas de criterio.
*980 Pero a los que han escogido el camino del estancamiento y del sabotaje contra el pueblo, sean del partido que sean, les digo: podrán hacer el camino más difícil, pero me enfrentaré a us-tedes y los vamos a dejar atrás.
Compatriota, ten la seguridad de que vamos a seguir adelante y vamos a superar la situación actual. Ya antes he librado batallas difíciles y he prevalecido con la fuerza de la verdad, de mis valores, de mi compromiso contigo. Solicitud de autori-zación para el uso de medios de difusión, apéndice, caso Núm.
CC-06-915, págs. 85-86.
En respuesta a la transmisión de este mensaje, el 3 de junio de 2005, al amparo de la Sec. 7.1 del Reglamento, pág. 13, el Oficial Examinador del Partido Independentista Puertorriqueño (P.I.P.), así como el del Partido Nuevo Pro-gresista (P.N.P.), sometieron sendas solicitudes de investi-gación ante la Junta Examinadora de Anuncios de la C.E.E.(4) En éstas alegaron que el señor Gobernador y la Corporación de Puerto Rico para la Difusión Pública difun-dieron el mensaje en cuestión, en violación a lo dispuesto en el Art. 8.001 de la Ley Electoral, supra, porque lo hicie-ron sin obtener la autorización previa para ello. A su vez, los oficiales examinadores cuestionaron la legalidad del contenido del mensaje, por entender que, en lugar de ser de emergencia, fue de corte político-partidista.
Ese mismo día, amparándose en la Sec. 4.2(B) del Re-glamento, pág. 10, la Oficina Central de Comunicaciones de la Fortaleza presentó ante la Junta una “Solicitud de Autorización para el Uso de Medios de Difusión” para in-dicar que el anuncio era de “interés público de urgencia”.(5) Señaló que “ante el escenario de incertidumbre económica *981 y social que vive el país y ante la incertidumbre que atra-viesa la Asamblea Legislativa”, el señor Gobernador “esti-mó necesario informar a todos los puertorriqueños, con ca-rácter de urgencia, sobre las prerrogativas consti-tucionales” que tiene para enfrentar inmediatamente la situación.
Aunque el señor Gobernador solicitó la desestimación de las querellas presentadas en su contra, la Junta celebró una vista donde las partes pudieron defender sus posturas. Posteriormente, el entonces Presidente de la Junta, Hon. Ramón E. Gómez Colón, rindió un informe en el que reco-mendó concluir que, tanto el señor Gobernador como la Corporación, violaron las disposiciones de la Ley Electoral, ya que tenían la obligación de solicitar la autorización de la C.E.E., antes de transmitir el mensaje por ese medio.
Insatisfecho, el Comisionado Electoral del Partido Popular Democrático (P.P.D.) llevó el asunto a discusión ante el seno de la C.E.E.
Luego de varios trámites, en noviembre de 2005, el en-tonces Presidente de la C.E.E., Hon. Aurelio Gracia Morales, acogió el informe de la Junta y dictó una resolución. Al así hacerlo, resolvió que al emitir el mensaje, sin autoriza-ción previa, el señor Gobernador violó lo dispuesto en el Art. 8.001 de la Ley Electoral.(6)
Inconforme con la determinación de la C.E.E., el señor Gobernador presentó oportunamente un “Escrito de Revi-sión Electoral” ante el Tribunal de Primera Instancia. En éste alegó que el propósito del Art. 8.001 de la Ley Electoral, supra, se circunscribe a límites específicos, por lo que la C.E.E. erró al concluir que lo infringió. Fundamentó su posición alegando que, en ausencia de una erogación di *982 recta de los fondos públicos por parte del E.L.A. para la compra de tiempo y espacio en los medios de difusión, no estaba obligado a solicitar la autorización de la C.E.E. Por otro lado, sostuvo que la decisión editorial del Canal 6 de transmitir su mensaje y el uso de los recursos para ello no podía configurar una violación de su parte al Art. 8.001 de la Ley Electoral, supra, ya que se trataba de una corpora-ción pública con personalidad jurídica independiente. Fi-nalmente argüyó que, aún asumiendo que el Estado hu-biera incurrido en gastos, fue innecesario el trámite previo ante la C.E.E. Ello, no sólo porque el tranque suscitado en la Asamblea Legislativa para la aprobación del presu-puesto para el año fiscal 2005-2006 configuró una situa-ción de excepción, sino también porque sus expresiones no tuvieron connotaciones político-partidistas.
En respuesta a la revisión solicitada, la C.E.E. sometió su oposición oportuna. De igual forma, los Comisionados Electorales del P.N.P y del P.I.P. presentaron por separado unas solicitudes de intervención que fueron aceptadas por el tribunal.(7) Posterior a ello, el señor Gobernador solicitó que el juicio de novo se convirtiese en una vista argumen-tativa, ya que las controversias planteadas eran estricta-mente de Derecho.
Celebrada la vista, el Tribunal de Primera Instancia re-solvió que, aunque no se pagó directamente por la trans-misión del mensaje, no había controversia en cuanto a que hubo un desembolso de fondos públicos para el pago de los salarios de los empleados del Canal 6 y de La Fortaleza, por el uso de un edificio público y por otros gastos operacionales. En vista de ello, estableció que el Art. 8.001 de la Ley Electoral, supra, debía interpretarse ampliamente y que el señor Gobernador lo había violado al no *983 solicitar la autorización de la C.E.E. previo a la difusión de su mensaje.
Inconforme con el dictamen de instancia, el Gobernador recurrió ante el Tribunal de Apelaciones. Este foro emitió una extensa sentencia mediante la cual revocó el dictamen recurrido. Al interpretar que el citado Art. 8.001 es de na-turaleza prohibitiva y punitiva, el Tribunal de Apelaciones determinó que su alcance debía interpretarse restrictiva-mente a base de la definición precisa de los términos utilizados. Señaló que la infracción del Art. 8.001 de la Ley Electoral, supra, no se refiere a cualquier gasto de fondos públicos, sino a uno que implique una contraprestación para la “adquisición onerosa de tiempo y espacio en los medios de difusión pública” y que tenga como “propósito diáfano” exponer logros y planes. Fundamentándose en es-tas interpretaciones, resolvió que el señor Gobernador no desembolsó fondos públicos para la compra de tiempo y espacio en los medios de difusión ni tampoco difundió propaganda político-partidista, por lo que no estaba sujeto a la obligación de obtener la aprobación previa de la C.E.E. para la transmisión de su mensaje. Asimismo, resolvió que se trató de un mensaje de urgencia y, en vista de ello, en-dosó la solicitud de autorización que el señor Gobernador presentó dentro de las cuarenta y ocho horas de haber emi-tido su anuncio, al amparo de la Sec. 4.2(B) del Regla-mento, supra.
Inconformes con este dictamen, la C.E.E. y los Comisio-nados Electorales del P.N.P. y del P.I.P. recurrieron ante nos. En esencia, sostienen que erró el Tribunal de Apela-ciones al no otorgarle deferencia a las determinaciones del foro de instancia, al entender que el Art. 8.001 de la Ley Electoral, supra, debía interpretarse restrictivamente y al, de esta forma, concluir que el señor Gobernador no incum-plió el estatuto cuando transmitió su mensaje el 1 de junio de 2005.
Examinadas las solicitudes presentadas, ordenamos la consolidación de los recursos y le concedimos a todas las *984 partes un término para expresar sus posiciones. Con el be-neficio de sus comparecencias, resolvemos.
II
Antes de abordar la controversia sustantiva, debemos atender el señalamiento de la C.E.E. y del Comisionado Especial del P.I.P., en cuanto a que el foro intermedio se excedió en el alcance de su facultad revisora al concluir que el tribunal de instancia no llevó a cabo un juicio de novo y, por ello, colocarse en su misma posición al evaluar la prueba.
 El proceso de revisión judicial de los asuntos ante la C.E.E., en cuanto a las impugnaciones de anuncios según la veda electoral, se establece en el Art. 1.016 de la Ley Electoral, 16 L.P.R.A. sec. 3016(a). Surge de esta disposi-ción que se trata de una revisión en la cual los tribunales de instancia tendrán que efectuar un juicio de novo de la determinación de la C.E.E. A esos efectos, deberán celebrar una vista en su fondo, recibir evidencia y formular las de-terminaciones de hecho y conclusiones de Derecho que co-rrespondan al revisar la decisión correspondiente. Íd.; Mi randa v. C.E.E., 141 D.P.R. 775 (1996). En estos casos, el tribunal revisor tiene la facultad de considerar todos los extremos de los asuntos planteados, tanto las determina-ciones de hecho como las conclusiones de Derecho.
En este caso, las partes reconocieron ante el Tribunal de Primera Instancia que no existía una controversia sobre los hechos y, por consiguiente, no presentaron evidencia en la vista celebrada. Las partes estipularon los hechos y ar-gumentaron sus interpretaciones sobre el derecho aplicable. Fundamentado en ello, el tribunal de instancia, luego de efectuar una interpretación independiente sobre la normativa aplicable, confirmó la determinación de la C.E.E.
Estando en la misma posición que el tribunal de instan-cia para interpretar el Derecho aplicable a los hechos in- *985 controvertidos, entendemos que el Tribunal de Apelaciones no se excedió en su facultad revisora al examinar las cues-tiones señaladas y al formular sus propias conclusiones de Derecho. Ya hemos establecido que no cabe hablar de defe-rencia judicial cuando la controversia estriba en efectuar una interpretación estatutaria, ya que los tribunales están en igual posición para entenderla.
En vista de que el foro intermedio revocó los dictámenes del tribunal de instancia y de la C.E.E., ahora “radica en este Tribunal la función de ser intérprete final de las leyes y la Constitución, así como la definición de sus contornos y la determinación de la validez de su ejercicio”. (Citas omitidas.) P.P.D. v. Gobernador II, 136 D.P.R. 916, 923 (1994).
Analizado este asunto preliminar, pasemos ahora a resolver la controversia sustantiva planteada ante nosotros.
III
A. Como cuestión de umbral, y por tratarse de una controversia novel, procede determinar si el Art. 8.001 de la Ley Electoral, supra, el cual prohíbe la difusión de anun-cios gubernamentales en periodos de veda electoral, debe interpretarse ampliamente para hacer cumplir su propó-sito legislativo o si, en cambio, debe interpretarse de forma restrictiva por contener disposiciones de naturaleza punitiva.
La See. 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1999, pág. 262, dispone que las “leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral”. De ahí surge el deber ineludible del Estado y de sus agencias de salvaguardar el principio de la libre selección del pueblo. Este pretende evitar que el Estado —mediante *986 anuncios gubernamentales— pueda tener una influencia en la libre expresión de los ciudadanos en la votación, con el poder económico que éste tiene mediante la utilización de los fondos públicos. P.P.D. v. Gobernador II, supra. Esta protección del ciudadano contra toda coacción en el ejerci-cio de su prerrogativa electoral permea todo sufragio, tanto las elecciones generales como los referéndums y los plebiscitos. íd.; Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445 (1993).
Asimismo, nuestra Constitución también dispone en su See. 9 del Art. VI, L.P.R.A., Tomo 1, ed. 1999, pág. 410, que “[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley”. A la luz de esta disposición, y a tono con el precepto anterior, hemos expresado en reiteradas ocasiones que el partido político al cual pertenece un Gobernador está impedido de utilizar los fondos o la propiedad pública para promover su postura en menoscabo del axioma de igualdad electoral. Marrero v. Mun. de Morovis, 115 D.P.R. 643 (1984); P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995).
A esos efectos, toda actuación que tienda a crear una desigualdad indebida o desventaja no justificada entre unos partidos políticos y otros es constitucionalmente impermisible. P.N.P. v. Hernández, Srio. D.T.O.P., 122 D.P.R. 362 (1988).
Inspirada por este marco normativo, y en aras de crear un mecanismo de fiscalización para salvaguardarlo, la Asamblea Legislativa aprobó el citado Art. 8.001 de la Ley Electoral, en el cual:
Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro de enero del año en que debe celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el pro- *987 pósito de exponer sus programas, proyectos, logros, realizacio-nes, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de in-terés público, urgencia o emergencia, los cuales sólo serán per-mitidos previa autorización al efecto de la Comisión Estatal de Elecciones. ... (Énfasis suplido.) 16 L.P.R.A. see. 3351.
Según los intereses implicados, resulta pertinente recor-dar que estamos compelidos a interpretar el alcance del referido Art. 8.001 de modo tal que prevalezca la impor-tante política pública que lo inspira. Chase Manhattan Bank v. Mun. de San Juan, 126 D.P.R. 759 (1990); C.E.E. v. Depto. de Estado, 134 D.P.R. 927 (1993). Ello, en vista de que la veda dispuesta en el Art. 8.001, supra, es una me-dida, entre otras posibles, para garantizar la paridad. Ésta no determina por sí sola el alcance del axioma de la igual-dad y la paridad económica entre partidos. Por ende, ante la clara intención legislativa de proteger el principio de la igualdad electoral, resulta inevitable concluir que, inde-pendientemente de las consecuencias que pueda tener la infracción del estatuto, el alcance que se le ha atribuido es amplio.(8)
B. Luego de examinar la naturaleza del alcance del Art. 8.001 de la Ley Electoral, supra, procede que determi-nemos si aquí se incurrió en gastos para la compra del tiempo y espacio en los medios de difusión que hicieran aplicables la disposición legal y, por consiguiente, activa-ran la obligación de solicitar la autorización para la difu-sión del mensaje especial.
*988 Contrario a lo resuelto por la C.E.E. y el Tribunal de Primera Instancia, en el caso de marras el Tribunal de Apelaciones exoneró de responsabilidad al señor Goberna-dor por entender que no hubo un gasto directo para la “ad-quisición onerosa” del Estado de la compra del tiempo y espacio de difusión. El foro intermedio interpretó que la infracción al Art. 8.001, supra, no se refiere a cualquier gasto, sino al que implique un desembolso del funcionario o de la agencia como contraprestación del “tiempo y espacio de difusión” recibidos.
Aun cuando reconocemos que el razonamiento del Tribunal de Apelaciones es cónsono con una lectura literal del texto de la ley, estamos impedidos de acogerlo por entender que no está en armonía con nuestra jurisprudencia inter-pretativa sobre el alcance, propósito y contenido de la veda electoral.
No podemos acoger una interpretación que restrinja la facultad de la C.E.E. para examinar sólo aquellos mensajes que requieran el pago de un precio cierto para su transmisión. La ausencia de una “adquisición onerosa” a cargo de los fondos públicos no puede eximir del cumpli-miento con la Ley Electoral ni con nuestra jurisprudencia interpretativa, toda vez que la intención del estatuto —conforme hemos visto— no sólo es evitar la influencia indebida del partido en el poder, sino también implantar la limitación impuesta a los funcionarios gubernamentales por el Art. VI, Sec. 9 de la Constitución de Puerto Rico, supra, relativa al uso apropiado tanto de las propiedades como de los fondos públicos. Véanse: P.S.P. v. Secretario de Hacienda, 110 D.P.R. 313 (1980); Marrero v. Mun. de Morovis, supra; P.P.D. v. Gobernador I, supra.
Según lo anterior, y dado el carácter novel de esta controversia, procede aclarar que, vigente una veda electoral, el mecanismo para solicitar la aprobación de la C.E.E. para difundir los anuncios o mensajes —aún en situaciones de interés público— aplica, ya sea por el desembolso directo de fondos públicos, el aprovechamiento de la propiedad pú- *989 blica o bien por el uso indirecto de otro tipo de beneficios, gastos o subvenciones derivados de los recursos públicos. Esta interpretación amplia del estatuto está en armonía con nuestros pasados pronunciamientos sobre el tema. Véanse: P.P.D. v. Gobernador II, supra; Miranda v. C.E.E., supra; P.N.P. v. Hernández, Srio. D.T.O.P., supra. De igual forma, es cónsona con una lectura integrada de la Ley Electoral.(9)
Aquí no está en controversia que se utilizaron propieda-des y empleados gubernamentales para coordinar la produc-ción y transmisión del mensaje, objeto de este litigio, ni que el mensaje se difundió con los recursos del Canal 6, el cual pertenece a una corporación pública —es decir, a una enti-dad gubernamental— que está sujeta a los límites constitu-cionales y estatutarios que regulan el deber de la informa-ción del Gobierno.(10)
En vista de ello, si bien es cierto que el señor Goberna-dor no incurrió en el gasto de un precio cierto para la com-pra del tiempo y espacio de difusión, entendemos que sí se benefició del uso de las instalaciones públicas, de los me-dios de producción, de los empleados públicos y gastos or-dinarios —tanto de la Oficina del Gobernador como de la Corporación de Puerto Rico para la Difusión Pública— para la transmisión de un mensaje a través del canal de televisión del E.L.A. Según esto, la difusión de su mensaje estaba ceñida por lo dispuesto en el Art. 8.001 de la Ley Electoral, supra.
*990 IV
Aclarada la aplicabilidad del Art. 8.001 de la Ley Electoral, supra, y, por ende, de la obligación de solicitar la autorización de la C.E.E. para difundir el mensaje, debe-mos examinar si las circunstancias del caso configuraron alguna situación de excepción que justificara obviar el trá-mite ordinario.
Amparándose en la obligación del Gobernador de man-tener informado al Pueblo sobre los asuntos que lo afectan, y tomando en consideración las dificultades que vislum-braba como Primer Ejecutivo por el tranque gubernamen-tal generado por dos de las Ramas del Gobierno, el Tribunal de Apelaciones entendió que la justificación que la Oficina del Gobernador envió a la C.E.E. —dentro de las cuarenta y ocho horas siguientes al mensaje— cumplió con el propósito legislativo. Fundamentó lo anterior en que el mensaje era de urgencia.
Conforme a la discusión que precede, el Art. 8.001 de la Ley Electoral, supra, prohíbe el uso de las instalaciones públicas, los medios de producción, los empleados públicos y gastos ordinarios para difundir un mensaje con el propó-sito de exponer programas, proyectos, logros, realizaciones, proyecciones o planes. Ahora bien, la disposición dispone dos excepciones; a saber, permite la difusión de (a) los avi-sos y anuncios expresamente requeridos por la ley y (b) los anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia que requieren la aprobación de la C.E.E. 16 L.PR.A. see. 3351. Ello, en con-cordancia con lo dispuesto en la citada See. 9 del Art. VI de nuestra Constitución.
Conforme al Reglamento, una urgencia o emergencia constituye una:
Situación de carácter súbito o imprevisto, ocasionada por actos del hombre o de la naturaleza, que requiere la inmediata divulgación de información por parte de una agencia, según el ámbito de sus deberes y fúnciones, a los fines de proteger la *991 vida, la propiedad o los derechos de la ciudadanía. Sec. 1.4(16) del Reglamento, pág. 4.
Este Reglamento dispone y regula el mecanismo procedente para transmitir los anuncios ante tales situaciones de emergencia o urgencia. A esos efectos, la See. 4.2, pág. 10, dispone:
(A) En aquellos casos en que cualquier agencia considere con razonable certeza que, durante el periodo de vigencia de este reglamento, pudiera surgir una situación o situaciones de tal naturaleza que, de ocurrir, justificarían la difusión de infor-mación de urgencia o emergencia mediante anuncios por los medios de difusión, podrá someter, ante el Secretario, en cual-quier momento, previa a la difusión del anuncio, una solicitud de autorización para la emisión de tales anuncios en caso de la ocurrencia de la situación o situaciones contempladas en la solicitud.
(B) En los casos en que la agencia considere que existe una situación extraordinaria de tal naturaleza que justifique la difusión de anuncios de urgencia o emergencia, sin que se hu-biese acogido al procedimiento de autorización establecido en el inciso anterior, tendrá que, no más tarde de las cuarenta y ocho (48) horas laborables, luego de la publicación del anuncio, radicar una justificación sobre la publicación ante la Comisión. (Enfasis suplido.)
Del primer párrafo de la sección citada, surge que la agencia tiene la facultad de hacer una determinación ini-cial sobre el carácter urgente o de emergencia del mensaje que pretende difundir. Esta determinación debe estar fun-damentada en la creencia de que es razonablemente certera la posibilidad de que durante el periodo de una veda electoral surja “una situación o situaciones de tal naturaleza que, de ocurrir, justificarían la difusión de información de urgencia o emergencia”. See. 4.2 del Reglamento, pág. 10, Es decir, éste no limita la difusión de un mensaje a la ab-soluta certeza de la ocurrencia del hecho, sino que atiende situaciones en las que cabe la posibilidad de que no ocurra un evento que justifique un pronunciamiento de emergencia.
Ahora bien, las disposiciones legales discutidas, *992 así como nuestra jurisprudencia, son claras al establecer que, incluso en las situaciones en las que se necesite divul-gar una información de emergencia o de urgencia, es nece-sario solicitar la aprobación previa de la C.E.E. para la difusión. Es decir, el hecho de que la información que ha-brá de ofrecerse sea de interés público, de urgencia o de emergencia no justifica obviar el mecanismo de fiscaliza-ción establecido en la Sec. 4.2(A) del Reglamento, supra, independientemente de que la divulgación afecte de forma significativa el bienestar de la ciudadanía en general o de que su difusión sea vital e indispensable.
Por lo tanto, aunque en el contexto administrativo el con-cepto “emergencia” no se limita necesariamente a una cir-cunstancia imprevista, sino que comprende un suceso o una combinación y acumulación de circunstancias que exigen una actuación inmediata —Meléndez Ortiz v. Valdejully, 120 D.P.R. 1 (1987)— esta situación no es suficiente para funda-mentar la legalidad de acogerse al mecanismo de autoriza-ción posterior a la difusión del mensaje.
Para acogerse al mecanismo de excepción presentado en la Sec. 4.2(B) del Reglamento, supra, se requiere que exista “una situación extraordinaria” que justifique prescindir del procedimiento legal ordinario para la difusión de los men-sajes urgentes. Sin embargo, es preciso aclarar que, aun cuando es imperante la regulación de las expresiones gu-bernamentales emitidas mediante el uso de recursos públi-cos, ni el Reglamento ni la Ley Electoral definen o estable-cen parámetros para determinar según qué circunstancias se justifica prescindir de la autorización previa requerida por la ley. Por ende, las situaciones en las que se exima a la agencia o al funcionario del cumplimiento con la obligación de solicitar la autorización previa deben evaluarse cuidadosamente.
Si bien la determinación de urgencia o emergencia se fundamenta en un criterio relativo a la certeza razonable de la posibilidad de un suceso, la determinación de circunstancias extraordinarias y excepcionales —a saber, *993 la “situación extraordinaria” expuesta en la Sec. 4.2(B) del Reglamento— debe fundamentarse en un criterio de inminencia. En este sentido, las circunstancias extraordi-narias son aquellas en las que existe una lesión inminente al interés público, de modo que una demora en la expresión gubernamental ofenda el sentido de la justicia; ocasione daños irreparables; perjudique los derechos constituciona-les de la ciudadanía; derrote el orden de ley, e incida inde-fectiblemente sobre la sana convivencia social.
Conforme a lo anterior, sólo si la situación, además de ser de emergencia o urgencia, es de carácter extraordinario o excepcional, se podría justificar la difusión del anuncio sin haber solicitado aprobación previa de la C.E.E. Ello, siempre que se someta ante dicha entidad una justificación de la publicación de la excepción dentro de las cuarenta y ocho horas siguientes a su transmisión.
En este caso, el señor Gobernador transmitió su men-saje especial el 1 de junio de 2005, al día siguiente de que su Oficina emitiera un comunicado de prensa para infor-marle a la ciudadanía su futura comparecencia. Funda-mentó la urgencia del mensaje en la situación de incerti-dumbre generada en el país por el tranque en la aprobación del presupuesto. Aunque no cabe duda de que el señor Gobernador, debido al cargo que ocupa, puede co-municarse con sus representados sobre los asuntos que afectan al País, la vigencia de una veda electoral impone los límites al modo como esa comunicación se debe efectuar.
En vista de estos límites, entendemos que no existía una situación extraordinaria de tal naturaleza que justifi-cara la difusión del mensaje luego de que se transmitiera. Aunque conocemos los conflictos que había entre los pode-res políticos sobre la confección del presupuesto para el año fiscal 2005-2006, el señor Gobernador tenía suficiente tiempo para solicitar la autorización de la C.E.E. en cual-quier momento antes de la transmisión de su mensaje. El mero hecho de que el mensaje se hubiera anunciado previo *994 a su difusión constituye un fundamento adicional para de-mostrar que no había una situación imprevisible, inmi-nente y excepcional que le impidiera acogerse al procedi-miento ordinario de solicitud de autorización.
V
Finalmente, procede que examinemos el contenido del mensaje en controversia, toda vez que los peticionarios ar-guyen que no configuró un gasto revestido del interés pú-blico ni se ajustó a los parámetros del Art. 8.001 de la Ley Electoral, supra, al difundir información prohibida por la veda electoral.
Sabido es que la búsqueda de un fin público es la condición positiva de toda actuación estatal. P.P.D. v. Gobernador I, supra; Marrero v. Mun. de Morovis, supra. En vista de ello, nuestro ordenamiento jurídico no permite la utilización de fondos, propiedades o recursos públicos para fines partidarios, esté o no en vigor una veda electoral.
El Reglamento para el Control de Gastos de Difusión Pública del Gobierno, vigente para la veda electoral ante nuestra consideración, reconoce en su “Declaración de Propósitos” la responsabilidad que tiene el Gobierno de poner a los ciudadanos en conocimiento de los diversos aspectos de interés público. Precisamente, define “información de interés público” como sigue:
Toda divulgación que afecte en forma significativa los dere-chos, las obligaciones, o el bienestar de la ciudadanía en general, en el ámbito de responsabilidad de cada agencia del go-bierno, según sus deberes y funciones y que por ser vital e indispensable se requiere que la ciudadanía advenga en cono-cimiento de la información propuesta. See. 1.4(5) del Regla-mento, pág. 3.
Aunque no podemos incidir sobre el ejercicio legítimo de los poderes constitucionales de las otras Ramas de gobierno, hemos resuelto que la determinación inicial *995 que tomen los poderes públicos sobre lo que es un fin público es revisable por el Poder Judicial. P.I.P v. C.E.E., 120 D.P.R. 580 (1988).
Conviene recordar que en P.P.D. v. Gobernador I, supra, tuvimos la oportunidad de examinar el concepto fin público, en el contexto de la divulgación de información gubernamental. En esa ocasión, señalamos que dicho concepto
... no es estático, sino que está ligado al bienestar general y que tiene que ceñirse a las cambiantes condiciones sociales de ■una comunidad específica, a los problemas peculiares que és-tas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja. Su significado ha cobrado un marco dimensional de naturaleza liberal, general-mente prevaleciendo el criterio de que los objetivos que estén contenidos en el referido fin público deben redundar en bene-ficio de la salud, seguridad, moral y bienestar general de todos los ciudadanos. (Énfasis suprimido.) íd., pág. 686.
En armonía con esa óptica, y en aras de determinar si hay un fin público implicado en la expresión gubernamental, nuestra jurisprudencia ha ido delimitando algunos criterios no taxativos para guiar nuestro ejercicio adjudicativo. Aplicados al contexto de este caso, la información de interés público durante el periodo de veda electoral:
(1) Redunda en beneficio de la salud, la seguridad, la moral y el bienestar general de todos los ciudadanos.
(2) Está destinado a una actividad de carácter público o semipúblico.
(3) Promueve los intereses y objetivos de la entidad guber-namental, en consonancia con sus deberes y funciones o la política pública establecida.
(4) Promueve programas, servicios, oportunidades y dere-chos, o adelanta causas sociales, cívicas, culturales, económi-cas o deportivas.
(5) Promueve el establecimiento, modificación o cambio de una política gubernamental. P.P.D. v. Gobernador I, supra, pág. 691.
Sin embargo, el análisis sobre el fin público no se detiene con la determinación de si está presente alguno de estos *996 criterios. En P.P.D. v. Gobernador I, supra, págs. 690-691, aclaramos que
... cuando el Gobierno, en el ejercicio de su facultad o deber de informar a la ciudadanía, utiliza o incorpora símbolos, emble-mas, colores, fotografías o lemas de naturaleza político-partidista, estamos impedidos constitucionalmente de recono-cerle fin público alguno a dicha expresión gubernamental. Tampoco podemos reconocer validez constitucional a cualquier expresión gubernamental difundida mediante el uso de fondos públicos cuando ésta claramente constituye un subterfugio para conferir una ventaja a un candidato o a un partido polí-tico, o para adelantar sus intereses político-partidistas.
De lo anterior se desprende que si se determina que el anuncio gubernamental se pretende utilizar como una vía para que un partido o candidato obtenga ventaja sobre otro —o para adelantar algún fin particular— el objetivo legítimo se anula y el anuncio no podrá justificarse o prevalecer. En efecto, en ese caso resolvimos específicamente que
... la publicación de expresiones gubernamentales mediante el uso de fondos públicos para la consecución de cualquiera de los objetivos enunciados anteriormente, en algunas ocasiones, puede tener el efecto incidental de producir cierto grado de ventaja al partido político en el poder o a un candidato de dicho partido. Pero cuando la evidencia demuestra, por el con-trario, que dicha expresión es utilizada como un vehículo para adelantar cualquier fin individual de dicho partido o candi-dato, anulando de tal forma la consecución de un objetivo le-gítimo, tal expresión no puede prevalecer por constituir una ventaja económica a dicho partido o candidato por sobre los partidos políticos o candidatos de oposición. (Enfasis nuestro.) P.P.D. v. Gobernador I, supra, págs. 691-692.
Conforme a ello, la prohibición del Art. 8.001, supra, “aunque amplia, no es absoluta, veda aquellos anuncios y publicaciones, directa e indirectamente, que de una u otra forma enaltecen o divulgan las ejecutorias del Gobierno”. Coss v. C.E.E., 137 D.P.R. 877, 885 (1995).
Aquí, independientemente de si el señor Gobernador te-nía la potestad para informarle al país sobre la naturaleza *997 de las diferencias entre las Ramas Ejecutiva y Legislativa con relación a la confección del presupuesto para el año fiscal 2005-2006, se desprende del texto del mensaje que él aprovechó la ocasión para divulgar los logros y planes de su gobierno e incorporó información con propósitos político-partidistas vedada por el ordenamiento electoral durante la celebración del Referéndum sobre el Sistema Cameral.(11)
Por un lado, en el mensaje se expusieron los planes del Gobierno para atender los problemas más apremiantes del país.(12) Asimismo, el señor Gobernador señaló los resulta-dos de su gestión gubernamental: “cortamos el gasto pú-blico, logramos una reducción en la criminalidad, inclu-yendo los asesinatos; cambiamos las prioridades de nuestro sistema educativo, creamos el programa Apoyo al de Aquí para generar empleos y sometimos decenas de me-didas legislativas y el presupuesto que están pendientes de aprobación”. Solicitud de autorización para el uso de me-dios de difusión, apéndice, caso Núm. CC-06-915, pág. 85. Finalmente, el funcionario aprovechó la difusión de su mensaje especial para realizar una crítica directa a sus opositores políticos.(13)
En atención a la naturaleza de los principios que la nor-mativa electoral pretende proteger, y en aras de armoni-zarlos tanto con el texto de la ley como con nuestra juris-prudencia interpretativa, debemos concluir que el mensaje en controversia sirvió como un vehículo para obtener una ventaja política indebida sobre los candidatos o partidos de oposición. Siendo así, el fin público que pudo haber moti- *998 vado la expresión gubernamental en las circunstancias de este caso no subsana la invalidez de su contenido a la luz de los parámetros establecidos por la normativa electoral.
VI
Por los fundamentos expuestos, revocamos la sentencia emitida por el Tribunal de Apelaciones por entender que no procedía la difusión del mensaje gubernamental —objeto de la controversia ante nuestra consideración— sin la pre-via autorización de la C.E.E.
No obstante, reconocemos que nunca antes se había re-suelto que, además de desembolsos directos de fondos pú-blicos, el aprovechamiento de la propiedad y recursos pú-blicos también constituyen “gastos” al amparo del Art. 8.001 de la Ley Electoral, supra. De igual forma, ésta es la primera vez que esbozamos unos criterios para determinar lo que constituye una situación extraordinaria que justifi-que difundir un anuncio o mensaje sin solicitar previa-mente la autorización de la C.E.E. a esos efectos.
En vista de lo anterior, la actuación del señor Goberna-dor se dio en ausencia de unas pautas precisas, en cuanto a la aplicabilidad de la disposición legal en las circunstan-cias de este caso. Esto es evidente si tomamos en conside-ración que el Tribunal de Apelaciones determinó que el mensaje difundido no violó la Ley Electoral. Por lo tanto, resolvemos que la normativa aquí establecida debe tener efecto prospectivo y, en consecuencia, no se aplicará al caso de autos ni a todo aquel que esté pendiente de adjudicación ante el Tribunal de Primera Instancia y el Tribunal de Ape-laciones que implique una controversia sobre la aplicabili-dad del Art. 8.001 de la Ley Electoral, supra, y su reglamento que se origine del mensaje difundido por el Gobernador Acevedo Vilá el 1 de junio de 2005. Véanse: Isla Verde Rental v. García, 165 D.P.R. 499 (2005); Quiles Rodríguez v. Supte. Policía, 139 D.P.R. 272 (1995); Gorbea Vallés v. Registrado, 131 D.P.R. 10 (1992).

*999
Se dictará Sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez no intervino.

 Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.RR.A. see. 3351.

 Véase la Ley del Referéndum sobre el Sistema Cameral de la Asamblea Legislativa, Ley Núm. 477 de 23 de septiembre de 2004 (16 L.P.R.A. see. 971 et seq.).

 La Comisión Estatal de Eleecciones (C.E.E.) fundamentó su decisión en lo resuelto en P.P.D. v. Gobernador II, 136 D.P.R. 916 (1994).

 La Sec. 7.1(A) de Reglamento, págs. 13-14, dispone que la C.E.E. podrá requerir la comparecencia de cualquier agencia a los fines de investigar el hecho de que cualquier información que se difunda por los medios de difusión sea autorizada previamente por la C.E.E., se ajuste a los términos de una autorización concedida o si —en caso de que se hubiera publicado sin autorización— constituya un anuncio requerido por ley.

 La Sec. 4.2(B) del Reglamento, pág. 10, prevé el no acogerse previamente al procedimiento de autorización establecido, si existe “una situación extraordinaria de tal naturaleza que justifique la difusión” del anuncio de urgencia o emergencia y se somete dicha justificación ante la C.E.E. dentro de las cuarenta y ocho horas labo-rables de la publicación del anuncio.

 Tomamos conocimiento judicial de que la C.E.E. resolvió de igual forma otra querella que se instó contra la Cámara de Representantes de Puerto Rico y su Pre-sidente, Hon. José F. Aponte Hernández, en virtud de un mensaje que, sin previa autorización de la C.E.E, este funcionario transmitió a través de los medios de difu-sión pública, en atención al mensaje difundido por el señor Gobernador. El quere-llado recurrió ante el Tribunal de Primera Instancia mediante un recurso de revisión electoral, el cual actualmente está pendiente de adjudicación. Véase caso Núm. KPE-05-4923, Cámara de Representantes y otros v. Comisión Estatal de Elecciones y otros.

 El Canal 6 presentó su solicitud de revisión electoral fuera del término ju-risdiccional de diez días, establecido en el Artículo 1.016 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. sec. 3016(a), y luego desistió del caso. Por ende, la decisión de la C.E.E. en lo que le respecta advino final, firme e inapelable.

 Según lo anterior, hemos sostenido como principio fundamental de herme-néutica que:
“ ‘[a]l interpretar una disposición específica de una ley, principios perseguidos por la Asamblea Legislativa al aprobarla y nuestra determinación debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener .... Nuestra obligación fundamental en estos casos, es imprimirle efectividad a la intención legis-lativa, propiciando de esta forma la realización del propósito que persigue la ley.’ ” Irizarry v.J & J Cons. Prods. Co., Inc., 150 D.P.R. 155, 163 (2000), citando a Dorante v. Wrangler of P.R., 145 D.P.R. 408, 417 (1998).

 La Ley Electoral específicamente prohíbe el uso de las estaciones del radio y televisión propiedad del Estado Libre Asociado de Puerto Rico por el partido del Gobierno para fines político-partidistas. 16 L.P.R.A. see. 3110. De igual forma, al referirse a los costos de producción de la publicidad de los partidos, señala que se deberá informar cualquier contribución en forma de bienes o servicios, tales como: vehículos, estudios, encuestas u otros de cualquier naturaleza, cuyo propósito sea promover el triunfo o la derrota de un partido o candidato. 16 L.P.R.A. see. 3113. Finalmente, entre los gastos que la Ley expresa que se pueden sufragar con dinero del Fondo Electoral, se encuentran los “gastos generales de oficina, incluyendo cáno-nes de arrendamiento, servicios en Puerto Rico de teléfono, telégrafo y correo; servi-cios de agua y energía eléctrica, gastos de viaje, equipo y maquinarias”. 16 L.P.R.A. see. 3118.

 Véase la Ley Orgánica de la Corporación de Puerto Rico para la Difusión Pública, Ley Núm. 216 de 12 de septiembre de 1996 (27 L.P.R.A. see. 501 et seq.).

 En efecto, el propio Tribunal de Apelaciones afirmó que “el Gobernador utilizó un tono inapropiado en algunas partes del mensaje e hizo referencia innece-saria a algunos logros y proyectos de su administración, los que ya había descrito con detalle en el mensaje de estado.” Sentencia del Tribunal de Apelaciones, 15 de agosto de 2006, pág. 47.

 A esos efectos, sostuvo: “Presenté un plan que denominé el Triángulo del Éxito para combatir el crimen, poner la educación en el sitial que se merece y pro-mover una nueva economía más fuerte, con más empleos.” Solicitud de autorización para el uso de medios de difusión, Apéndice, caso Núm. CC-06-915, pág. 85.

 Indicó que está “bueno ya de que algunos políticos sigan retrasando tu progreso” y luego reiteró que éstos se habían quedado en el pasado, que se habían dedicado a sus luchas de poder y no a trabajar para el Pueblo.